

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

———————————————————

Elliot M. Hirsch,

        Plaintiff,

v.

Rabbi Yitzchak Yisraeli, Rabbi David Maslaton, Michelle Abtan Amsellem, Murray Betesh, Laurie Beda, Joel Borenstein, Jay R. Butterman, Sherry Chera Halabi, Lauren Dagmy, Sari Dana, Miriam Elisheva Yarimi, Yeshiva of Flatbush Joel Braverman High School LLC, The Edmond J. Safra Synagogue Inc., Miriam Sabzehroo, Raquel Sabzehroo, Eve Scaba, Deborah Shiloach, Eva Shammah, Norma Tawil, Heshy Tischler, Dalia Oziel, Adina Miles, Nourite Maimon, Sarah Mizrachi, Elizabeth Kairey, Isabella Khaimov, Rabbi Eli J. Mansour, Abraham Manopla, Dr. Mark Rand, Amber Adler, Rabbi Harold Sutton, Rabbi Max Sutton, Yafah Sutton, City of New York, John and Jane Doe 1-10 Defendants.

        Defendants

———————————————————

**Case number: To be assigned**

**Complaint and Demand for Jury Trial**

## <u>INTRODUCTION</u>

    1.     This is a civil action arising from a targeted, coordinated campaign of harassment, religious coercion, and public defamation carried out against Plaintiff, Elliot M. Hirsch, by a network of individuals, institutions, and public figures. Beginning in early March 2021, Defendants initiated a concerted effort to compel Plaintiff to issue a Jewish religious divorce document, known as a Get, through sustained public pressure that included illegal protests, coordinated social media campaigns, reputational attacks, and physical intimidation. These efforts were designed to force a private religious act under duress — in violation of Plaintiff's constitutional rights and civil protections.

2.      Among the participants were political candidates for public office, who used their official campaign platforms to threaten legislation targeting individuals like Plaintiff and to promote and amplify the coercive campaign. Members of religious institutions, community activists, and online influencers joined in, contributing to an atmosphere of fear, incitement, and hostility.

3.      Despite having prior notice of these unlawful events — including unpermitted mass protests outside Plaintiff's home and the homes of others — law enforcement, particularly the New York City Police Department, failed to intervene. Officers responded but took no meaningful action, choosing not to disperse the crowds or enforce applicable laws. This inaction created a pattern of selective enforcement and emboldened the escalation of harassment. Ultimately, under severe and unlawful emotional, communal, and reputational pressure, Plaintiff submitted to the act that this campaign was built to extract. He physically handed over a Get under circumstances that invalidated it according to both Jewish and civil law. This Complaint seeks redress for the coordinated abuse of religious, legal, and social power that led to that moment — and for the lasting injuries it caused to Plaintiff's dignity, rights, and well-being.

4.      Plaintiff was not the only victim of this coercive campaign. Within the same seven-day period in March 2021, at least two other men — Dibo Hafif and Jonathan Abtan — were also pressured into giving Jewish divorces under similarly unlawful circumstances. Their Gets, issued on or about March 14, 2021 and presided over by Rabbi Pinchos Rabinowitz, were later nullified by that same rabbi due to illegal coercion and false pretenses. Under Jewish law, a coerced Get is invalid unless a religious court (a Beit Din) has authorized the coercion — which never occurred in any of these cases.

5.      In Plaintiff's case, the officiating rabbi, Yitzchak Yisraeli, was promptly notified that the Get had been given under pressure, but failed to investigate or intervene as Jewish law requires. Plaintiff believes Rabbi Yisraeli's failure to act was due to improper influence or financial bias from Elizabeth Kairey's supporters.

6.      Plaintiff anticipates that Defendants will attempt to invoke the "religious entanglement" doctrine in an effort to insulate themselves from civil liability. However, federal courts have already rejected this argument in cases involving similar abuse of religious frameworks. In United States v. Mendel Epstein, prosecuted in the District of New Jersey, the FBI and Chief Judge Freda Wolfson held that self-described Orthodox Jews could be criminally prosecuted for violently coercing men to issue Gets. That decision affirmed the principle that religious motivation does not excuse conduct that violates federal criminal or civil law.

7.      While Defendants here did not physically assault Plaintiff, they engaged in psychological warfare: publicly shaming him, threatening ongoing harassment, and instigating reputational and communal retaliation — all with the clear goal of forcing religious compliance through unlawful means. Such conduct is not protected religious expression; it is tortious and potentially criminal. Further, the Defendants' actions directly contradict the very religious standards they claim to uphold. According to Jewish law, it is strictly prohibited to embarrass or coerce another Jew into giving a Get, and any such decree must be issued only with the authorization of a Beit Din. Defendants did none of this.

8.      While Plaintiff does not ask this Court to interpret or enforce religious doctrine, the contradiction between Defendants' claimed Orthodox Jewish identity and their unlawful tactics underscores the bad faith and pretextual nature of their campaign. Their conduct violated civil rights, defamed Plaintiff, and weaponized religion as a cover for coercion. The Court — just

as Judge Wolfson did in the Epstein prosecutions — is fully empowered to provide redress in the civil arena for this abuse of power masked as religious activism.

9.       Plaintiff respectfully notes that references to Jewish law and tradition in this Complaint are offered solely to provide relevant context. They are not intended to suggest that Judaism endorses, authorizes, or tolerates the Defendants' behavior — quite the opposite. In traditional Jewish teachings, public humiliation is likened to murder and, in some instances, considered so severe as to be punishable by death. Threats, coercion, and psychological pressure aimed at forcing a religious divorce are expressly forbidden. The Defendants acted entirely outside the bounds of any legitimate Jewish legal framework. They do not represent Orthodox Judaism or any authentic expression of its values. Plaintiff urges the Court and all readers of this Complaint not to view these events as reflective of Judaism or its teachings, but rather as a perversion of them — committed for personal, political, and ideological gain.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1)(diversity jurisdiction), as Plaintiff is a citizen of the State of New Jersey, and all Defendants are citizens of other states, including but not limited to the States of New York, Ohio, and Texas. The amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as the action arises under the First and Fourteenth Amendments to the United States Constitution, and includes claims brought under 42 U.S.C. §§ 1983, 1985(3), and 1986. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions

giving rise to the claims occurred in the Eastern District of New York, including the planning, promotion, and execution of the harassment campaign and unlawful acts alleged herein.

## PRIOR PROCEEDINGS

11.    Plaintiff originally filed this case in the United States District Court for the District of New Jersey in or about 2021, under docket number 3:21-cv-12246. The case was assigned to Chief Judge Freda L. Wolfson. Over the course of that litigation, Judge Wolfson reviewed the allegations and issued multiple orders directing Plaintiff to amend his complaint. At no time did the court raise concerns about the existence of subject matter jurisdiction. In fact, in a written order, Judge Wolfson expressly acknowledged that Plaintiff had properly alleged diversity jurisdiction under 28 U.S.C. § 1332, and the case proceeded on that basis for over a year. After one or more Defendants moved to transfer the case, venue was changed to the United States District Court for the Eastern District of New York, where it was docketed as 1:22-cv-05011-ERK and assigned to the Honorable Eric R. Komitee. That court likewise allowed the action to proceed for more than two years and directed Plaintiff to file further amended pleadings. At one point, Judge Komitee directed Plaintiff to shorten the complaint.

12.    Despite this extensive procedural history, the Eastern District of New York dismissed the action on April 22, 2025, without prejudice for lack of subject matter jurisdiction under 28 U.S.C. § 1332. The dismissal was not based on the merits of any of Plaintiff's claims. Instead, the Court found that Plaintiff had failed to adequately allege the citizenship of the Defendants, citing the use of the term "resides" rather than "domiciled."

13.     Plaintiff then filed a motion for reconsideration pursuant to Rule 59(e), along with a letter-motion seeking leave to amend the complaint to both correct the jurisdictional allegations and assert newly discovered federal claims. On May 6, 2025, the Court denied the motion for reconsideration and declined to grant leave to amend.

14.     Because the prior case was expressly dismissed without prejudice and solely on jurisdictional grounds — and not based on the merits of Plaintiff's federal or state claims — Plaintiff is now reasserting his claims in this new action. That dismissal permits Plaintiff to refile this case and to assert any and all claims arising from the same operative facts, including claims not previously raised. Moreover, because the court lacked subject matter jurisdiction, it had no authority to issue binding rulings on the merits, and any such rulings — even if described as "with prejudice" — are legally void and carry no preclusive effect in this action. Plaintiff is therefore entitled to revive previously asserted claims and bring additional causes of action based on the same events.

15.     While Plaintiff had initially hoped to proceed by simply amending his prior complaint, the Court's ruling made clear that the only remaining option for pursuing justice was to initiate a new action. Plaintiff brings this complaint in good faith and in full compliance with all applicable rules and procedures, seeking to have his claims adjudicated on the merits. Plaintiff also notes for the Court's reference that his prior cases — including the original action filed in the United States District Court for the District of New Jersey and all related proceedings transferred to this Court — were approved for in forma pauperis (IFP) status, based on a finding of sufficient financial hardship. Plaintiff's financial condition has not improved since that time; to the contrary, he now faces an even more burdensome financial situation, including a civil

judgment of over $100,000 entered against him as a direct consequence of the events described in this complaint. Plaintiff respectfully submits this filing with the understanding that his IFP eligibility remains unchanged, and in fact is further supported by his current level of indebtedness.

**PARTIES**

**Plaintiff:** Elliot M. Hirsch is a citizen of the State of New Jersey and is domiciled at 7 Saxony Drive, Oakhurst, New Jersey 07755.

16.    Defendant Rabbi David Maslaton is a citizen of the State of New York and is domiciled at 1849 E 27th St, Brooklyn, NY 11229.

17.    Defendant Laurie Beda is a citizen of the State of New York and is domiciled at 441 Quentin Road, Brooklyn, NY 11223.

18.    Defendant Norma Tawil is a citizen of the State of New York and is domiciled at 2039 East 8th Street, Brooklyn, NY 11223.

19.    Defendant Amber Adler is a citizen of the State of New York and is domiciled at 1775 East 13th Street, Apt. 5F, Brooklyn, NY 11229.

20.    Defendant Heshy Tischler is a citizen of the State of New York and is domiciled at or conducts business from 5318 16th Avenue, Brooklyn, NY 11204.

21.    Defendant Miriam Elisheva Yarimi is a citizen of the State of New York an is domiciled at 1452 East 12th Street, Brooklyn, NY 11230(currently in jail).

22.     Defendant Yeshiva of Flatbush Joel Braverman High School is a limited liability company organized under the laws of the State of New York. Upon information and belief, all of its members are citizens of the State of New York, and it maintains its principal place of business at 1609 Avenue J, Brooklyn, NY 11230.

23.     Defendant Adina Miles is a citizen of the State of New York and is domiciled at 1416 East 16th Street, Brooklyn, NY 11230.

24.     Defendant Eve Scaba is a citizen of the State of New York and is domiciled at, or conducts business from, 1966 East 21st Street, Brooklyn, NY 11229.

25.     Defendant Nourite Maimon is a citizen of the State of New York and is domiciled at 14 Manhattan Court, Brooklyn, NY 11223.

26.     Defendant Lauren Dagmy is a citizen of the State of New York and is domiciled at 1745 East 7th Street, Brooklyn, NY 11223.

27.     Defendant Sarah Mizrachi is a citizen of the State of New York and is domiciled at 1653 Ocean Parkway, Brooklyn, NY 11223.

28.     Defendant Yafah Sutton is a citizen of the State of New York and is domiciled at 1953 East 24th Street, Brooklyn, NY 11229.

29.     Defendant Elizabeth Kairey is a citizen of the State of New York and is domiciled at 1531 East 3rd Street, Brooklyn, NY 11230.

30.     Defendant Isabella Khaimov is a citizen of the State of Ohio and is domiciled at 31967 Kenyon Circle, Solon, OH 44139.

31.    Defendant, The Edmond J. Safra Synagogue Inc. is a New York religious corporation with its principal place of business at 1801 Ocean Parkway, Brooklyn, NY 11223.

32.    Defendants Miriam Sabzehroo and Raquel Sabzehroo are citizens of the State of New York and are domiciled at 1130 East 27th Street, Brooklyn, NY 11210.

33.    Defendant Sari Dana is a citizen of the State of New York and is domiciled at 1925 East 5th Street, Brooklyn, NY 11223.

34.    Defendant Sherry Chera Halabi is a citizen of the State of New York and is domiciled at 2064 Ocean Parkway, Brooklyn, NY 11223.

35.    Defendant Dalia Oziel is a citizen of the State of Texas and is domiciled at 7147 Dogwood Creek Lane, Dallas, TX 75252.

36.    Defendant Deborah Shiloach is a citizen of the State of New York and is domiciled at 2315 Avenue S, Brooklyn, NY 11229.

37.    Defendant Eva Shammah is a citizen of the State of New York and is domiciled at 920 Avenue L, Brooklyn, NY 11230.

38.    Defendant Rabbi Eli J. Mansour is a citizen of the State of New York and is domiciled at 1970 East 14th Street, Brooklyn, NY 11229.

39.    Defendant Rabbi Yisraeli is a citizen of the State of New York and, upon information and belief, is domiciled in Brooklyn, New York. His exact residential address is currently unknown to Plaintiff.

40.    Defendant Rabbi Harold Sutton is a citizen of the State of New York and, upon information and belief, is domiciled in Brooklyn, New York. His exact residential address is currently unknown to Plaintiff.

41.    Defendant Rabbi Max Sutton is a citizen of the State of New York and is domiciled at 1589 East 2nd street, Brooklyn, New York, 11230.

42.    Defendant Abraham Manopla is a citizen of the State of New Jersey and is domiciled at 286 Berger Ave, Oakhurst, NJ 07755. Only Federal claims are being asserted against Manopla.

43.    Defendant Murray Betesh is a citizen of the State of New Jersey and is domiciled at 500 Roseld Ave, Deal, NJ 07723. Only Federal claims are being asserted against Betesh.

44.    Defendant Michelle Abtan Amsellem is a citizen of the State of Maryland and is domiciled at 5225 Pooks Hill Rd #522S, Bethesda, MD 20814.

45.    Defendant Dr. Mark Rand is a citizen of the State of New York and is domiciled at 514 49th St, Brooklyn, NY 11220.

46.    Defendant Joel Borenstein is a citizen of the State of New York and is domiciled at 316 State Street, Brooklyn, NY 11201.

47.    Defendant Jay R. Butterman is a citizen of the State of New York and is domiciled at 800 3rd Ave 15th floor, New York, NY 10022.

48.    Defendant City of New York is a citizen of the State of New York and is domiciled at 350 Jay Street, Brooklyn, New York 11201.

## STATEMENT OF CLAIM

49.     The incidents giving rise to this action occurred on social media platforms including WhatsApp and Instagram, as well as in physical locations such as Oakhurst, New Jersey, and Brooklyn, New York. While many Defendants are described in detail in the factual allegations above, some do not have separate standalone fact sections. This was done intentionally for the sake of clarity and brevity, as their roles were more limited, behind-the-scenes, or closely intertwined with the specific causes of action asserted against them. To avoid unnecessary repetition, their involvement is fully set forth and incorporated in the cause of action sections where their conduct is most directly relevant.

## FACTS

**I.    DEFENDANT EDMOND J. SAFRA SYNAGOGUE INC.**

50.     Defendant Edmond J. Safra Synagogue Inc. ("Safra") is an Orthodox Jewish synagogue located at 1801 Ocean Parkway, Brooklyn, New York. Plaintiff's ex-wife, Elizabeth Kairey, and her parents are members of this synagogue. The synagogue's official email address is info@EJSS.org, as listed on its website. The head rabbi of Safra is Rabbi Eli J. Mansour. Rabbi Mansour and his wife, Sandra Mansour, are close relatives of Elizabeth Kairey and her father, Ikey Kairey.

51.     On or about March 8, 2021, Safra created and launched a public fundraising campaign on the Orthodox crowdfunding platform The Chesed Fund, using the following URL: https://thechesedfund.com/jacobskassinchesedfund/freeelizabeth. The Chesed Fund provides clients full control over campaign content and donor comment settings. Campaign organizers can choose whether to allow public comments by donors and can determine whether donations are

directed to personal or nonprofit accounts. No identity verification is conducted for donor names, and comments may be left anonymously.

52.     The fundraising page initially featured a photograph of Elizabeth Kairey and Plaintiff's daughter, along with the following text:

"THIS CAMPAIGN IS ENDORSED BY RABBI ELI MANSOUR. Jacob S. Kassin Hessed Fund. All donations are tax deductible. HELP FREE ELIZABETH!
A young woman in our community who has been refused a GET for almost 4 years and needs her life back!
… He has REFUSED to pay any child support and has REFUSED to give her freedom, despite the direction of the Beit Din.
… This man is waging a relentless legal campaign against Elizabeth and her family including appeals of every decision of the civil court. He has been instructed by the Beit Din to give a get and on numerous accounts refused. REFUSING A GET IS ABUSE AND IT NEEDS TO STOP!"

53.     The campaign also included a "Share Campaign" button and the hashtag #FreeElizabeth, facilitating mass distribution of the defamatory material. At no point did the Chesed Fund monitor, censor, or remove highly inflammatory and threatening comments made by donors. Examples of comments posted and retained on the page include:

- "Let's break his legs that bastard."
- "Elliot you are evil. Elizabeth, as you can see everybody loves you. Stay strong."

- "Boycott Dr. Jonathan Hirsch."

- "Let's make a physical gathering and make him give that GET now. No one is free of his evil deeds."

- "Wow, let's do that, good idea, he'll regret every day he held her back. Where do we go? He'll get scared and give it immediately."

54.      On March 11, 2021, at approximately 8:30 PM — just moments after Plaintiff handed over the Get to Elizabeth Kairey — the fundraising page was updated to declare victory. It read in part:

"Elizabeth is Free. THANK YOU EVERYBODY FOR YOUR AMAZING SUPPORT! … She is officially free!! Baruch Hashem!

THIS CAMPAIGN IS ENDORSED BY:

RABBI ELI MANSOUR – Head Rabbi of Edmond J. Safra Synagogue

RABBI HAROLD SUTTON – Magen David Yeshivah

RABBI TIDHAR COHEN – Beit Horaah 'Emet Vasedek'

RABBI MAX SUTTON – Rosh Beit Din Aram Soba, Jerusalem

Created by the Edmond J. Safra Synagogue Inc. c/o Jacob S. Kassin Hessed Fund

1801 Ocean Parkway, Brooklyn, NY. Tax ID: 205569592."

55.      On or about March 14, 2021, the content of the fundraising page was removed, but the URL remains live and accessible to this day. The campaign ultimately raised $128,353.29 from 1,066 donors, according to data displayed on the Chesed Fund site.

## II.      DEFENDANT ELIZABETH KAIREY

56.     Plaintiff and Defendant Elizabeth Kairey were married on November 5, 2013, in Kings County, Brooklyn, New York.

57.     On or about June 26, 2018, Elizabeth Kairey filed for divorce against Plaintiff in Kings County Supreme Court under index number 53206/2018. She was represented beginning on or about March 1, 2019, by attorney Jay R. Butterman, who continued representing her through at least May 4, 2023.

58.     In March 2021, Defendant Kairey became a central participant in a public and coercive campaign titled the "Free Elizabeth" movement, which falsely portrayed Plaintiff as an abuser and religious noncompliant individual in an effort to pressure him into giving her a Jewish divorce (*Get*). This campaign included online fundraising, community organizing, and targeted protests.

59.     On March 9, 2021, Plaintiff filed a proposed order to show cause in New York State Supreme Court seeking a restraining order against Kairey due to her involvement in the Free Elizabeth campaign. Plaintiff also personally emailed Kairey at that time, warning her of the threats of violence and death threats he was receiving as a result of her public campaign. Plaintiff pleaded with her to stop participating in the protests and internet incitement, noting that it was placing both himself and their daughter in danger.

60.     On March 11, 2021, at approximately 7:00 PM, Defendant Kairey appeared at the home of Mr. Harry Adjmi in Brooklyn, New York, to participate in a Get ceremony presided over by Rabbi Yitzchak Yisraeli. At approximately 8:15 PM, Plaintiff, under emotional and social duress, handed her the *Get*.

61.    Within one hour of receiving the *Get*, Kairey appeared on two separate Instagram Live videos hosted by Abraham Manopla and Dalia Oziel. During these live broadcasts, she publicly thanked both Manopla and Oziel for their roles in the Free Elizabeth campaign and extended her appreciation to the wider community who supported the pressure campaign against Plaintiff.

62.    That same evening, a large public party was held at Kairey's residence, located at 1531 East 3rd Street, Brooklyn, NY. The event was attended by hundreds of individuals, alcohol was served, and celebratory videos were broadcast on social media. During the event, Kairey appeared holding a t-shirt featuring Abraham Manopla with the title "Get Buster," a phrase coined on March 10, 2021, by Manopla and Murray Betesh to describe their role in forcibly extracting Jewish divorces from men.

63.    In subsequent sworn testimony, Kairey admitted that she received a large portion of the $128,000 raised through the Free Elizabeth Chesed Fund campaign. She also testified that she had knowledge of who created the webpage but declined to name those individuals.

64.    Kairey further admitted that she provided the campaign's organizers with a photograph of herself and the parties' daughter, which was used as the banner image for the fundraising webpage and printed protest flyers. This image was also displayed on her Instagram profile. Notably, while the Chesed Fund webpage blurred the child's face, Kairey's personal Instagram did not.

65.    Defendant Kairey was directly responsible for providing the text content used in the fundraising campaign, which falsely alleged that Plaintiff refused to pay child support, defied

religious court orders, and inflicted ongoing harm. These statements were materially false, defamatory, and made with the intent to incite public hatred against Plaintiff.

66.     On the Instagram Live video with Dalia Oziel, Kairey declared that the mission was "not complete" and named other women she believed needed help obtaining Gets, including a woman named Chava Sharabani. This statement further indicated her broader role in an organized and ongoing coercive campaign beyond her individual divorce.

67.     Kairey also made and circulated false accusations that Plaintiff sexually and physically abused her. These defamatory statements were intentionally spread to strengthen the pressure campaign and portray Plaintiff as a public threat to justify continued harassment.

68.     Kairey's participation in the Free Elizabeth campaign was not passive. She was a planner, instigator, and active beneficiary of the coercive tactics that included unpermitted protests, false public statements, and threats of violence. Her conduct was intentional, malicious, and directly contributed to the coercion of a religious act from Plaintiff under duress.

## III.    DEFENDANT RABBI ELI J. MANSOUR

69.     Defendant Rabbi Eli J. Mansour is a prominent Orthodox Jewish rabbi, recognized internationally for his teachings and lectures, which reach hundreds of thousands of Orthodox Jews. He is the multimillionaire head rabbi of the Edmond J. Safra Synagogue Inc. in Brooklyn, New York.

70.     Rabbi Mansour and his wife, Sandra Mansour, are both close relatives of Ikey Kairey, the father of Elizabeth Kairey. He is financially supported by many affluent members of the Syrian Jewish community, and is known to wield significant influence over rabbinic and

communal endorsements.

71.     In Orthodox Jewish circles, rabbinic endorsements are essential to the success of fundraising and activism campaigns. When Rabbi Mansour endorses a cause, it signals legitimacy to others in the community and often triggers the support of subordinate rabbis. Campaigns without rabbinic backing typically fail.

72.     On March 8, 2021, the Free Elizabeth Chesed Fund campaign was launched online and prominently declared it was "endorsed by Rabbi Eli Mansour." Over the next two days, additional rabbis were added to the campaign as endorsers, but Rabbi Mansour's name remained featured at the top.

73.     Upon information and belief, Rabbi Mansour was not merely a passive endorser. He actively supported and helped coordinate the campaign's efforts, including communications with Defendants Shammah, Khaimov, and Manopla. These individuals repeatedly stated online that their actions, including social media posts and organizing protests, had the explicit backing of Rabbi Mansour.

74.     On March 9, 2021, Plaintiff's father, Dr. Jonathan Hirsch, met with Rabbi Yisroel Reisman at Agudath Yisroel of Madison Synagogue in Brooklyn and initiated a speakerphone call with Rabbi Mansour. During the call, Mansour affirmed to Rabbi Reisman that he supported the Free Elizabeth campaign. When Rabbi Reisman rebuked him and explained that such support was prohibited under Jewish law, Mansour replied, "It's time for Elliot to give the Get," and admitted the Chesed Fund campaign was only the beginning of a larger strategy to extract it.

75.     Later that day, Plaintiff called Rabbi Mansour, directly. In that 8-minute call, Mansour confirmed that he had spoken with Reisman and Plaintiff's father. He told Plaintiff he

hoped he would give the Get, acknowledged his support for the campaign, and advised Plaintiff to contact Rabbi Reisman to negotiate "reasonable" terms before the situation escalated further.

76.    Plaintiff followed up with Mansour by text message the next day, pleading with him to cease his support of the campaign. Mansour ignored both texts.

77.    Throughout the week of March 8, 2021, Defendant Manopla repeatedly stated during live video broadcasts that Rabbi Mansour endorsed the protests and supported continued escalation until both Plaintiff and Dibo Hafif gave Gets to their respective wives.

78.    On or about March 10, 2021, Defendant Manopla and Rabbi Mansour exchanged emails with Mr. Dibo Hafif, who begged them to stop coordinating and supporting the protests. Manopla told Hafif he had only one option: give the Get. Rabbi Mansour replied in agreement with Manopla's message, reinforcing the coercive demand.

79.    On March 11, 2021, following Plaintiff's coerced issuance of a Get to Elizabeth Kairey, Rabbi Mansour attended a "Get party" held at Kairey's residence at 1531 East 3rd Street, Brooklyn, NY. He appeared in photographs smiling and holding an alcoholic beverage.

80.    During this party, Defendant Manopla initiated a live video stream with Rabbi Mansour as his guest. On the video, Manopla credited Mansour's endorsement as the reason the Get was secured. Mansour nodded in agreement and thanked Manopla. He then stated, "Our work is not done. Abe, let's go partners."

81.     When Manopla mentioned that other women still needed Gets, Mansour responded, "We will knock 'em off like bowling pins." He stated that he had created a list of men he would next target, including someone named Joey Michon.

82.     Mansour did note that while he believed Kairey was in the right, he understood that not every case was so clear-cut. Nevertheless, he publicly affirmed his judgment and support in the Kairey matter.

83.     Several months later, Rabbi Mansour appeared on a public video interview with Rabbi Ephraim Goldberg, which was broadcast to thousands of viewers in the Orthodox Jewish world. In the interview, Goldberg directly asked about his role in the Free Elizabeth campaign.

84.     Rabbi Mansour admitted his involvement and expressed no regret. He claimed no force was used and that the Gets obtained were valid. He also expressed a casual admiration for mafia-style operations and joked about his interest in mob stories.

85.     Rabbi Mansour did not inform the audience that multiple rabbinical courts had invalidated Gets given under similar coercive circumstances, including in the cases of Dibo Hafif and Jonathan Abtan.

86.     In or around December 2022, Rabbi Mansour privately admitted to Mr. Hafif that he had made a mistake by supporting the protests and acknowledged that he was unfamiliar with the relevant halachic (Jewish legal) standards governing divorce.

87.     Defendant Mansour used his rabbinic authority and community status to initiate, endorse, and maintain a coercive and defamatory campaign to extract a religious act from

Plaintiff under pressure. He was central to the orchestration, legitimization, and execution of a
scheme that resulted in substantial harm to Plaintiff and others.

## IV.    DEFENDANT LAURIE BEDA

88.    Defendant Laurie Beda is the maternal aunt of Elizabeth Kairey and a central
participant in the "Free Elizabeth" campaign. Upon information and belief, Beda leveraged her
familial relationship and social media presence to help organize, amplify, and escalate the
coercive campaign against Plaintiff.

89.    On or about March 8, 2021, Beda used her Instagram account, under the handle
"lauriebeda," to share and promote the Free Elizabeth Chesed Fund webpage. Her account
publicly displayed a photo of herself and her husband, Leon Beda, as its profile icon. The link to
the campaign remained live on her profile through at least March 14, 2021 and was not removed
until approximately August 2022.

90.    On March 10, 2021, Beda participated in an Instagram Live video hosted by
Defendant Abraham Manopla, which was titled "peaceful protest" but in fact functioned as an
online rally to plan and incite illegal protest action. During the broadcast, Beda posted several
inflammatory comments including:

- "Don't forget Elizabeth! Hirsch is playing you. There is no positive movement,"
- "Blast this to Hirsch,"
- "Nothing from Hirsch," and
- "I am credible."

91.     In response to Beda's comments, other participants escalated the rhetoric with comments such as "Go to Hirsch house," "7 Saxony tonight. We going raw," "Let's raise hell," "Beating," and "Share his number." These statements referred directly to Plaintiff's home address and personal phone number, both of which were circulating widely at the time.

92.     Plaintiff was sent screenshots of the live comments by multiple individuals who were alarmed that Beda's statements were prompting threats and calls to action that endangered Plaintiff and his family. These communications included explicit plans to gather at Plaintiff's home in Oakhurst, NJ on the evening of March 10, 2021 — which did occur.

93.     During the live broadcast, Manopla read aloud Beda's comments on air, thereby validating and amplifying them. This incitement contributed directly to the turnout of a raucous crowd of protestors that night outside Plaintiff's New Jersey residence.

94.     On March 11, 2021, at approximately 11:00 AM, Beda appeared at an illegal protest held at Corporal Wiltshire Park in Brooklyn, NY, located around the corner from Plaintiff's father's medical practice. The protest, which involved 60–80 people, was pre-planned to march toward the office at 2136 Ocean Ave. The protestors used signs and loudspeakers, despite not having secured permits as required by law.

95.     Beda co-led this protest and was photographed standing beside signs reading "Free Elizabeth" and "Withholding a Get is Abuse." Her role was vocal and visible. Upon information and belief, she helped coordinate turnout and messaging.

96.    Rabbi David Ozeri, a prominent Sephardic rabbi, attempted to calm the situation and spoke directly with Beda. In response to Rabbi Ozeri's plea not to escalate further, Beda shouted, "If he doesn't give the Get today, we will be there [his office] tomorrow — and then their house tomorrow." This was clearly understood as a threat to continue and expand the protests to Plaintiff's home and his father's home.

97.    In the same exchange, Beda confirmed the effectiveness of the pressure campaign by replying, "Only because of this," when Rabbi Ozeri stated, "This is the closest we've ever gotten" and "This pressure is working."

98.    During the protest, Beda revealed knowledge of a prior order of protection and I-Card issued against Plaintiff in a separate court proceeding, indicating her access to and use of private legal information to enhance her credibility and incite public outrage.

99.    Beda further encouraged protestors and online viewers to call Dr. Hirsch's medical office and flood the phone lines with messages demanding a Get. That day, his staff received calls approximately every 20 minutes from individuals yelling "Give the Get!" disrupting patient care and damaging his practice.

100.   She also encouraged viewers to post false negative reviews of Dr. Hirsch online. On March 11, 2021, four such reviews were published on Google, each from names not associated with the practice's patient list, accusing Dr. Hirsch of misconduct and spreading defamatory lies. These reviews have proven costly and difficult to remove, causing reputational harm and financial distress to Dr. Hirsch.

101.    On March 10, 2021, Beda orchestrated additional harassment activities at Plaintiff's Brooklyn residence. A woman was directed to leave fliers stating "Free Elizabeth. Give her a GET" in Plaintiff's backyard, dump garbage bags in front of the property, and place bags of dog feces in the family's trash bins. Upon information and belief, Beda coordinated or approved this conduct as part of a broader campaign to intimidate and humiliate Plaintiff.

102.    Beda's conduct was not isolated nor incidental. Her role in the protests, social media coordination, messaging, and incitement reflect a knowing and deliberate participation in a campaign designed to use unlawful and humiliating tactics to pressure Plaintiff into religious compliance under threat of public harm.

## V.    DEFENDANT NORMA TAWIL

103.    Defendant Norma Tawil is the daughter of Defendant Laurie Beda and a close relative of Elizabeth Kairey. At all relevant times, she operated an Instagram account under the handle "Norma.Tawil," where her profile icon featured a family photo with her husband, attorney Ralph Tawil, and a young child.

104.    Upon information and belief, Norma Tawil played an active role in supporting and amplifying the Free Elizabeth campaign through coordinated online activity and in-person participation at protests and celebratory gatherings associated with the coercion of Plaintiff.

105.    On or about March 11, 2021, during a live Instagram video hosted by Defendant Abraham Manopla, Norma Tawil posted a public comment addressed to Plaintiff stating:

"Elliot I feel bad for you that you sit home all day doing nothing except troll Abe's page. Get a life. Fake attorney. I bet you failed the bar exam more than once."

This comment was "liked" by several viewers, signaling both approval and wide visibility within the online campaign's viewership.

106.    On or about the same day, a comment posted under the name "Norma Tawil" appeared on the Free Elizabeth Chesed Fund campaign page. It read:

"Free Elizabeth so that she can get her life back."

107.    This statement echoed the central theme of the campaign — applying social pressure and public shaming in an effort to compel Plaintiff to surrender a religious divorce document (*Get*).

108.    Later that day, Norma Tawil was present at the illegal protest held at Corporal Wiltshire Park in Brooklyn, New York, which took place near the office of Plaintiff's father, Dr. Jonathan Hirsch. This protest was coordinated and premeditated, lacking a permit, and employed amplified sound and signage accusing Plaintiff of religious abuse.

109.    That same evening, at approximately 9:00 PM on March 11, 2021, Tawil was observed at the celebratory "Get party" held at the home of Elizabeth Kairey at 1531 East 3rd Street, Brooklyn, New York. The party included dozens of attendees, loud music, and alcoholic beverages. Tawil's presence at the event signaled her continuing involvement in the campaign, including post-Get celebrations that effectively validated and rewarded the coercion applied against Plaintiff.

110.    Upon information and belief, Tawil's participation in these events was not incidental. As the daughter of Laurie Beda and a member of Kairey's extended family, she

was aware of the campaign's goals and methods, and deliberately chose to contribute to its public pressure and humiliation efforts, both online and in person.

111.    Norma Tawil's statements, presence at illegal protests, and celebratory participation demonstrate knowing and active involvement in the campaign to pressure Plaintiff into a coerced religious act through coordinated intimidation and reputational harm.

## VI.    DEFENDANT HESHY TISCHLER

112.    Defendant Heshy Tischler is a political commentator and media personality who, during the week of March 8–12, 2021, was actively campaigning for New York City Council in the 48th District. Upon information and belief, Tischler used his campaign platform and public persona to support, lead, and amplify the coercive Get campaign against Plaintiff and others.

113.    Tischler participated in protests on March 9 and 10, 2021, outside the home of Dibo Hafif in Brooklyn, New York. These protests were unlawful, unpermitted gatherings that escalated into riots involving property damage, vandalism, and threats of violence. Upon information and belief, Tischler arrived with a loudspeaker and was greeted with chants of "Heshy, Heshy, Heshy," confirming his status as a recognized leader and inciter of the crowd.

114.    Tischler used his Instagram and other social media platforms to promote his presence at the protests and encourage further attendance. He posted videos, photographs, and statements claiming that unless a Get was delivered, he would "name and shame" men like Plaintiff on his radio show "every single day."

115.    Tischler openly stated at the Hafif protest that if Hafif did not give a Get, he would continue to publish his name publicly and harass him until he did. He declared this would be his approach toward all men in similar positions. His comments, made as a political candidate, blurred the line between personal advocacy and state action, threatening to legislate religious compliance by force.

116.    Tischler is a convicted felon with a prior conviction related to inciting a riot — a history which, upon information and belief, contributed to the escalation of violence at the protests he attended. The crowd outside Hafif's home threw eggs, entered the backyard, and caused property damage to air conditioning units, behavior which was incited and inflamed by Tischler's presence.

117.    Tischler also appeared at the protest outside Corporal Wiltshire Park on March 11, 2021, and led the crowd alongside Defendant Amber Adler. During the protest, he held a sign stating "No GET, No Peace," and posed for photographs with supporters of Elizabeth Kairey, including relatives holding defamatory signs falsely labeling Plaintiff an abuser.

118.    Tischler gave a speech at the March 11 protest, stating: "We are at a demonstration. This guy Elliot Hirsch did not give a GET. And we are here demonstrating, and we are going to get that GET."

119.    He went on to reference an alleged conversation with a federal judge and told the crowd, "They are asking us not to come over there to Dr. Hirsch's office, I know you want to go over there," strongly implying mob-style pressure.

120.    On March 12, 2021, Tischler posted a photograph of himself at the protest, writing: "Elizabeth Kairey Hirsch got her get," thereby publicly celebrating the coerced result of the week's harassment and falsely taking credit for the outcome.

121.    Upon information and belief, Tischler's statements and conduct were intended to promote his political candidacy and appeal to religious constituencies, using Plaintiff's personal religious status as political capital. His involvement directly contributed to the emotional and reputational harm suffered by Plaintiff, and constituted unlawful incitement, harassment, and religious coercion.

## VII.    DEFENDANT AMBER ADLER

122.    Defendant Amber Adler was also a candidate for New York City Council in the 48th District during the week of March 7–12, 2021. She actively participated in the Get-coercion campaign and used her campaign social media accounts, including Instagram, to publicize, promote, and participate in the protests against Plaintiff and others.

123.    On March 9 and March 10, 2021, Adler attended the protests outside the residence of Dibo Hafif in Brooklyn, which grew to hundreds of participants and involved violent and unlawful behavior including trespassing, threats, and property damage. Adler posted photos and videos of these events to her Instagram account and encouraged others to attend.

124.    Adler held signs reading "No GET, No Peace," a phrase deliberately echoing political protest slogans and intended to frame Plaintiff's religious conduct as abusive and unlawful. Her statements incited further outrage and depicted Plaintiff and others as public enemies deserving of state intervention.

125.    Adler gave speeches to the crowd and falsely accused men who had not given a Get of committing "coercive control" and abuse. She did so while standing on public property, using a loudspeaker, and posting the footage to her campaign social media channels.

126.    On March 11, 2021, Adler appeared at the protest at Corporal Wiltshire Park in Brooklyn, held just blocks from Plaintiff's father's medical office. Adler co-led the event with Tischler and again held "No GET, No Peace" signage. She appeared in photographs with supporters of Elizabeth Kairey who held defamatory and inciting messages directed at Plaintiff.

127.    During the March 11 protest, Adler gave a public speech in which she promoted her efforts to advance legislation in the New York State Legislature that would make it a felony for a man to withhold a Get. Upon information and belief, Adler's statements were not only legally unfounded but served to incite the crowd and position herself politically at Plaintiff's expense.

128.    Adler's actions were amplified through her campaign account, giving them the appearance of official policy positions. Her public presence, endorsement of protest tactics, and legislative threats created a chilling effect on Plaintiff's ability to freely exercise his religious and personal rights.

129.    Adler's participation was not driven solely by ideology but also by a calculated political strategy. Her involvement in the protests helped her gain media attention, including being featured in Vogue Magazine in connection with the events at issue in this case.

130.    Defendant Adler's conduct was intended to mobilize public hostility, apply pressure through political means, and portray Plaintiff and others as criminal or abusive solely

for exercising religious conscience. Her role was instrumental in escalating the campaign to a level that caused Plaintiff severe emotional harm, reputational injury, and religious coercion.

## VIII.  DEFENDANT ADINA MILES

131.    Defendant Adina Miles, also known publicly as "FlatbushGirl," is a well-known Orthodox Jewish feminist influencer with a substantial social media following. As of March 2021, her Instagram account had approximately 55,700 followers. She is recognized as a public figure and activist, particularly within the Orthodox Jewish community.

132.    On or about March 9, 2021, Miles posted on her Instagram account a screenshot of the Free Elizabeth Chesed Fund campaign webpage with the caption "Free Elizabeth." In that same post, she called upon her followers to attend a protest scheduled to begin at 10:00 AM on March 11, 2021, at Corporal Wiltshire Park in Brooklyn, New York.

133.    In subsequent posts, Miles made clear that the protest's purpose was to publicly shame, pressure, and humiliate Plaintiff into giving Elizabeth Kairey a Get. She stated, in sum and substance, that these protests would continue unless and until Plaintiff complied.

134.    On March 11, 2021, Miles attended and co-led the protest at Corporal Wiltshire Park. She was seen in multiple videos — both taken by others and posted by herself — using a loudspeaker to lead chants and incite protestors. Her participation was highly visible and influential, and she acted as a key figure at the demonstration.

135.    During the protest, Miles issued an explicit threat, stating that if Plaintiff did not provide the Get that day, she would return to continue the protests the next day. She reaffirmed this threat by posting it on her Instagram account that same day.

136.    That evening, after Plaintiff was pressured into giving the Get, Miles posted videos on her Instagram account celebrating the protest and showing herself directing protestors with the loudspeaker.

137.    On March 12, 2021, Miles posted a public Instagram message stating:

"Elizabeth is free. Get refusers, you will be next. We will publicly humiliate you. We will have you fired from your job. We will find ways to have you arrested. And we will not rest until every prisoner is set free."

This post, widely viewed and circulated, made clear that Miles supported not just public shaming, but employment retaliation, legal targeting, and online harassment of men in Plaintiff's position.

138.    Upon information and belief, Miles was paid by organizers of the Free Elizabeth campaign to encourage participation from her large follower base and to lead the protest events. She used the publicity generated by her involvement to promote her personal brand and career, including being featured in high-profile media coverage.

139.    On or about March 31, 2021, Vogue Magazine published an article quoting Miles about the Get protest. In it, she stated:"We're not backing down."

140.    She described filming the protest and receiving 40,000 views on her social media content. According to the article, the Get was given that night, highlighting the causal connection between the online and physical pressure and the Plaintiff's coerced act.

141.    In another article published by journalist Avital Goldschmidt, Miles was

quoted stating: "Social media works. Activism works. Pressure works," when referencing Plaintiff's case.

142.    She went on to say, "We will have you fired from your job. We will publicly humiliate you. We will find ways to have you arrested," further illustrating the coercive, punitive, and retaliatory nature of the campaign she led.

143.    Defendant Miles's actions, statements, and coordination with others contributed materially to the hostile environment surrounding Plaintiff. Her use of public influence and social media threats inflicted emotional trauma, reputational injury, and religious coercion — all for the purpose of compelling Plaintiff's compliance with a religious act under pressure.

144.    Miles's coercive tactics were not limited to Plaintiff's case. In the months and years that followed, she engaged in similar conduct targeting at least two other Orthodox Jewish men — Itzhak Rubinov and Jonathan Ben Amo — in efforts to pressure them into giving Gets. Rubinov has since filed a civil lawsuit in the Eastern District of New York under docket number 24-CV-04375 (NCM) (LB), while Ben Amo has filed suit in the same district under docket number 1:25-cv-02532. Both lawsuits allege coordinated campaigns of online harassment, reputational attacks, and coercion led or supported by Adina Miles. These post-incident actions reinforce the ongoing and open-ended nature of her conduct and demonstrate that Plaintiff's experience was not an isolated episode but part of a sustained pattern.

IX.    **DEFENDANT YESHIVA OF FLATBUSH LLC**

145.    On March 11, 2021, during a regular school day, approximately ten female students from Yeshiva of Flatbush Joel Braverman High School in Brooklyn, New York, attended the protest organized at Kings Highway and Ocean Avenue to pressure Plaintiff into delivering a Get to Elizabeth Kairey.

146.    These students were visibly present at the illegal, unpermitted protest for approximately two to three hours and were accompanied by a faculty chaperone, Ariella Stavrach Falack. The protest was one of the culminating events in a broader campaign of public harassment and religious coercion directed against Plaintiff.

147.    The students took a group photograph during the protest, which depicted one of them holding a sign that read "Let Her Go" — echoing the rhetoric of the Free Elizabeth campaign and reinforcing the coercive message.

148.    Upon information and belief, these students received "chesed hours" — i.e., community service credit — from the Yeshiva of Flatbush for their participation in the protest. Chesed hours are a mandatory graduation requirement for students of the Yeshiva, which requires completion of at least 50 hours per year.

149.    Plaintiff, as a former student of the Yeshiva, is personally familiar with the school's policies and procedures regarding service hours and confirms that attendance at such events is treated as an official school-sponsored activity when chesed credit is awarded.

150.    The awarding of chesed hours for protest participation indicates institutional endorsement of the event, particularly given that the protest was not a legally sanctioned

demonstration, but a coordinated public pressure campaign intended to extort religious compliance through shame and intimidation.

151.    Yeshiva of Flatbush is one of the most prominent Jewish Orthodox educational institutions in the country and holds itself out as a moral and spiritual authority within the Brooklyn Sephardic community. Its encouragement — explicit or implicit — of student involvement in a campaign of unlawful coercion violates both its civic responsibilities and its educational mission.

152.    The school failed to conduct any disciplinary or remedial review of the students' attendance at the protest and continued to credit them with community service for their involvement in an activity that constituted civil harassment and religious incitement.

X.    DEFENDANT MIRIAM ELISHEVA YARIMI

153.    Defendant Miriam Elisheva Yarimi, who operates an Instagram account under the name "@iitsanellie," is a social media influencer with approximately 11,000 followers as of March 2021 — a substantial audience in the Orthodox Jewish online community.

154.    Yarimi used her social platform and physical presence to co-lead the coercive Get campaign against both Plaintiff and Dibo Hafif.

155.    On March 9 and March 10, 2021, Yarimi was seen co-leading the crowds gathered outside the Brooklyn residence of Dibo Hafif. These gatherings were unpermitted, unlawful protests that escalated into aggressive riots involving over one thousand people. The events included threats, property damage, and mass chanting, and were aimed at coercing Hafif to issue a Get.

156.    During the protests, Yarimi used a loudspeaker to incite and energize the crowd. She publicly chanted coercive slogans such as:

"No Get, No Peace,"

"No justice, no peace," and

"We will be here every single night harassing your life."

157.    These statements were made before a highly charged crowd and were clearly intended to threaten and intimidate Hafif into religious compliance.

158.    On March 10, 2021, while actively leading the protest outside Hafif's residence, Yarimi publicly announced to the crowd — again using a loudspeaker — that they should all attend the "Free Elizabeth" protest scheduled for the next day, March 11, 2021, at 10:00 AM.

159.    On March 11, 2021, at approximately 1:00 PM, Yarimi posted an update to her Instagram account informing her followers that Dibo Hafif had been arrested earlier that day. She used that announcement as a rallying cry to shift the protest focus toward Plaintiff, Elliot Hirsch. In that same post, she publicly named Plaintiff and stated that she would later announce the time and location for the next riot — this time to pressure Plaintiff into giving a Get to Elizabeth Kairey.

160.    Yarimi's role in these events was not isolated or incidental. She acted knowingly, purposefully, and with intent to incite religious coercion, reputational harm, and emotional distress to Plaintiff and others.

161.    Yarimi's participation and promotion of these protests — both in person with loudspeakers and online to her thousands of followers — materially advanced the coercive campaign that ultimately caused Plaintiff to issue a Get under duress. Her public actions contributed to the atmosphere of intimidation and violence that surrounded Plaintiff during this time.

## XI.    DEFENDANT NOURITE MAIMON

162.    In March 11, 2021, Defendant Nourite Maimon attended the protest organized at Corporal Wiltshire Park in Brooklyn, New York, which was expressly aimed at pressuring Plaintiff to issue a Get to Elizabeth Kairey. Maimon was visibly present next to Defendant Laurie Beda when Beda made public threats that protests would continue that evening and the next day unless Plaintiff complied with the mob's religious demands.

163.    Maimon was seen on video standing beside Beda during this announcement, providing both visual and vocal support for the coercive actions planned and executed that day.

164.    Later that afternoon, at approximately 3:00 PM, Maimon appeared as a featured guest on a widely viewed Instagram Live video hosted by Abraham Manopla, titled "Hirsch Update." The livestream attracted over 5,000 viewers and was part of a coordinated effort to mobilize community outrage and protest participation.

165.    During her appearance on the live video, Maimon made multiple public statements designed to shame, intimidate, and provoke action against Plaintiff. She stated:

> "Looks like Elliot Hirsch is playing around, which is nothing new. And the minute
> we hear that this GET is not going through — really, everybody in this community

that has a pulse has to be there to support Elizabeth. The march this morning — I was there. To tell you the truth, the show was a little disappointing. And when Rabbi Ozeri said he would be there the next morning, I felt that would really make a statement. I don't have much to say except that every person in this community needs to be there, and I know it's Friday morning and it's Shabbat. This is a human rights issue. And it's everybody."

166.    Maimon further urged continuous pressure, stating:"Don't let the pressure down. Rabbi Ozeri said that the only reason this family is at the table as we speak is because all of us are putting on the pressure. Wrong is wrong. I do not stand by people who do wrong to other people."

167.    She concluded with an aggressive personal attack on Plaintiff and a veiled threat of legal escalation:"Our rabbis cannot do this alone. We, as a people, have to come together and we are an army. And Elizabeth needs her army. But guess what? Elliot Hirsch keeps referring to himself as a lawyer, lawyer, lawyer. He is no lawyer. And we have a real lawyer on our hands who is ready to go to battle for us — Moshe Maimon."

168.    Moshe Maimon, referenced by Nourite Maimon, is her husband and a named partner at the law firm Levi Konigsberg LLP. Her invocation of his name during this inciting speech further suggests coordinated efforts between social, legal, and religious actors to pressure Plaintiff under threat of public retaliation and litigation.

169.    Maimon's public statements, social media participation, and in-person protest involvement materially contributed to the coercive environment that forced Plaintiff into religious compliance. Her conduct amplified the campaign's reach,

intensified public pressure, and reinforced the threats that led to the delivery of the Get under duress.

## XII.    DEFENDANT EVE SCABA

170.    On March 11, 2021, Defendant Eve Scaba appeared as a guest speaker on an Instagram Live broadcast hosted by Abraham Manopla titled "Hirsch Update." The broadcast took place around 3:00 PM and was viewed by over 5,000 individuals. It served as a forum for organizing and inciting further protest action against Plaintiff, Elliot Hirsch.

171.    During the livestream, Scaba publicly stated that she had attended the protest that morning at Kings Highway and Ocean Avenue, which was held for the purpose of coercing Plaintiff into delivering a Get to Elizabeth Kairey. Her participation confirmed her active role in the campaign.

172.    In that same video, Scaba expressly named Plaintiff, stating: "Hirsch. It's not fair what's happening to Elizabeth," aligning herself with the Free Elizabeth campaign and signaling support for further action to pressure Plaintiff into religious submission.

173.    In response to a statement by Manopla — who attempted to temper the rhetoric by saying, "but you know again it's their life… you know there is so much you can infringe on other people's lives" — Scaba dismissed this concern and escalated the tension. She responded:

"Honestly, I think everyone should go tonight. And that is what we said we are going to do. 9 or 10 PM at night. If nothing happens by then. We need to go again."

Manopla then asked, "Where, the parent's house?" to which Scaba responded, "Of course." When Manopla raised the point, "But what if he's not at the parent's house?"

Scaba replied coldly, "Who cares? It's the same thing with Dibo. Everyone went to the house and he was not there."

174.    These statements clearly demonstrate Scaba's support for targeting Plaintiff's family residence — regardless of whether Plaintiff himself was present — and reflect the escalation from protest to personal intimidation, trespass, and threat of mob action.

175.    During the same livestream, viewers began attacking Manopla in the comment section for appearing to defend Plaintiff. In response, Manopla clarified: "Guys. These commenters. I am not defending him. I am not defending him." This public exchange further reinforced the mob mentality fostered by the broadcast and contributed to the coordinated campaign of harassment.

176.    Scaba's appearance and statements on the livestream were part of a broader effort to organize and encourage illegal protest activity, to normalize threats against Plaintiff's person and family, and to pressure him through reputational, social, and psychological coercion.

177.    Scaba made her remarks with full knowledge of the coordinated nature of the campaign, and her words contributed materially to the atmosphere of intimidation that directly preceded Plaintiff's coerced delivery of a Get later that same day.

**XIII.  DEFENDANT LAUREN DAGMY**

178.    On or about March 10, 2021, Defendant Lauren Dagmy used her Instagram account, identified as "@len_dagmy," to publish a defamatory and inciting post targeting

Plaintiff, Elliot Hirsch. The post consisted of a photograph of Plaintiff with multiple overlaid captions including:

"Get Refuser Alert,"

"Elliot Hirsch,"

"Justice for Elizabeth,"

and at the top of the image, in bold letters: "Abuser."

179. Dagmy shared this post on her Instagram story, where it was visible to all of her approximately 703 followers. Her account is followed by numerous members of the local Orthodox Jewish community, and the post was designed to publicly shame, defame, and isolate Plaintiff.

180. The statements made in the post were entirely false and defamatory. Plaintiff was never adjudicated to have committed abuse, and the use of the label "abuser" was intended to inflame public opinion and subject Plaintiff to scorn, threats, and reputational harm.

181. In addition to labeling Plaintiff an "abuser," Dagmy explicitly called upon her followers to further disseminate the post and to ostracize Plaintiff from the community. Her post included a directive to the public that Plaintiff should not be "serviced in any way" — an instruction designed to cut off Plaintiff from both personal and professional relationships and to create economic and social pressure.

182. The timing of the post — immediately preceding the protest outside Plaintiff's New Jersey residence and the illegal gatherings near his father's Brooklyn office — demonstrates

its coordination with the broader Free Elizabeth campaign and its role in furthering the collective coercion against Plaintiff.

183.    Dagmy's public dissemination of false, incendiary, and malicious content amplified the harm Plaintiff experienced, both by reinforcing the campaign's defamatory narrative and by encouraging mass participation in his harassment and isolation.

## XIV.    DEFENDANT SARAH MIZRACHI

184.    During the week of March 8 to March 11, 2021, Defendant Sarah Mizrachi actively participated in the public defamation campaign directed against Plaintiff by publishing and circulating false and inflammatory content across social media platforms.

185.    On or about that week, Mizrachi posted a photograph of Plaintiff and his parents on her WhatsApp Status — a broadcast feature visible to all of her contacts — accompanied by messaging that accused Plaintiff of "withholding a Get." This post publicly exposed Plaintiff and his family members to reputational harm, communal pressure, and social targeting.

186.    On or about March 8, 2021, Mizrachi, using her Instagram account under the handle @gourmet_handmade, posted a public comment on a post made by Defendant Eva Shammah. In her comment, Mizrachi explicitly named Plaintiff as the individual at the center of the Free Elizabeth campaign.

187.    Mizrachi's comment further expressed confusion and frustration as to why "Community News," an Orthodox-focused social media publication, failed to mention Plaintiff's name in its own coverage of the Free Elizabeth campaign. Her comment encouraged the outlet

and others to identify Plaintiff more explicitly, thereby inciting further public harassment and social stigma.

188.    In addition to the above, Mizrachi made multiple comments across Instagram referring to Plaintiff as a "Get refuser," fully aligning herself with the defamatory narrative promoted by the Free Elizabeth campaign. These posts labeled Plaintiff as abusive and noncompliant with Jewish law, even though no Rabbinical Court had issued such a determination or authorized public protest or coercion.

189.    Mizrachi's actions contributed materially to the public pressure placed upon Plaintiff during the days leading up to March 11, 2021, and helped amplify the false narrative that ultimately resulted in Plaintiff delivering a Get under duress.

## XV.    DEFENDANT YAFAH SUTTON

190.    On March 11, 2021, Defendant Yafah Sutton participated in the illegal protest at the intersection of Kings Highway and Ocean Avenue in Brooklyn, New York, which was organized to coerce Plaintiff into delivering a Get to Elizabeth Kairey.

191.    During the protest, Sutton held a large cardboard sign that falsely accused Plaintiff of committing abuse against Elizabeth Kairey and included the slogan "Free Elizabeth," in furtherance of the ongoing harassment and reputational attack against Plaintiff.

## XVI.    DEFENDANT ISABELLA KHAIMOV

192.    On or about March 9, 10, and 11, 2021, Defendant Isabella Khaimov, using her Instagram account "@schugspiceandeverythingrice," which had approximately 2,500 followers, made multiple public posts promoting the Free Elizabeth campaign.

193.    Khaimov reposted the contents of the campaign fundraising page and made the following false statements about Plaintiff:

"He has never paid any child support,"
"Elizabeth has been refused a Get for almost 4 years," and
"He has refused to give her her freedom."

194.    Khaimov encouraged followers to donate, stating "Link in bio to donate. Or DM me for link," and added that the campaign was "endorsed by Rabbi Eli Mansour and Rabbi Harold Sutton," leveraging religious authority to legitimize the campaign and amplify social pressure.

195.    In a separate video post, Khaimov stated that because Rabbi Eli Mansour had endorsed the campaign, she believed it was automatically worthy of support and donations, urging others to follow suit based on that rabbinic endorsement.

## XVII. DEFENDANT MIRIAM SABZEHROO

196.    Defendant Miriam Sabzehroo is one of the two account holders and operators of the Instagram account "@community.news," a widely followed social media outlet with approximately 19,000 followers as of March 2021. The account is influential within the Orthodox Syrian Jewish community and known for disseminating community-related information.

197.    On or about March 8, 2021, Miriam Sabzehroo posted screenshots from the original "Free Elizabeth" chesed fund campaign webpage. These screenshots contained defamatory claims about Plaintiff, falsely accusing him of abuse, withholding a Get, and financial abandonment of his wife and child.

198.    Each of the three posts received approximately 890 likes, indicating widespread community engagement and encouragement. These posts materially contributed to the reputational pressure and coordinated harassment campaign against Plaintiff.

199.    In the captions below the posts, Miriam Sabzehroo invited followers to request a link to the campaign and urged them to "please spread the word," further amplifying the defamatory message.

200.    On March 9, 2021, she also published to the Community.News account a flyer created by Defendant Adina Miles that advertised the planned protest to take place on March 11, 2021, at Corporal Wiltshire Park in Brooklyn — a protest later attended by numerous defendants and aimed at coercing Plaintiff to issue a Get.

201.    In the comment section of these posts, numerous threats were made against Plaintiff. One such comment, posted by Abraham Manopla, stated: "We need to introduce beatings for these kinds of atrocities." These comments remained visible and uncensored under the Community.News platform.

**XVIII. DEFENDANT RAQUEL SABZEHROO**

202.    Defendant Raquel Sabzehroo is the second known operator and account holder of the Instagram page "@community.news," which collaborated in disseminating the Free Elizabeth campaign materials.

203.    Together with Miriam Sabzehroo, Raquel Sabzehroo published, reposted, and endorsed the original March 8, 2021 content from the Free Elizabeth campaign. These posts falsely accused Plaintiff of being an abusive and negligent spouse and parent, and promoted a campaign of public intimidation and defamation.

204.    Raquel Sabzehroo actively encouraged the spread of this content by authoring captions such as "please spread the word," thereby endorsing further circulation and community pressure against Plaintiff.

205.    The content Raquel helped publish contributed directly to Plaintiff's stigmatization, communal isolation, and the psychological duress that ultimately culminated in his coerced delivery of a Get on March 11, 2021.

206.    By enabling and curating a platform where users made threatening, inciting, and defamatory remarks about Plaintiff — without moderation or removal — Raquel Sabzehroo participated in and advanced the broader conspiracy aimed at coercing Plaintiff through public harassment.

207.    The description of said post stated "this is not ok. Free Elizabeth now."

## XIX.  DEFENDANT SARI DANA

215.    Her publication and endorsement of the campaign contributed to the spread of defamatory content and the intensifying social pressure placed on Plaintiff, in furtherance of the broader conspiracy.

## XXI.    DEFENDANT SHERRY CHERA HALABI

208.    Defendant Sari Dana is the owner of the Instagram account "@zensari_," which had approximately 3,300 followers as of March 2021.

209.    On or about March 8, 2021, Dana posted a screenshot of the Free Elizabeth chesed fund campaign on her Instagram story. The post included a picture of Elizabeth Kairey and Plaintiff's daughter — the same photograph that appeared on the original campaign page.

210.    Dana captioned her post with the following statement:

"Refusing to give a get is abuse and it must stop. Endorsed by Rabbi Eli Mansour. Link is in bio @evashammahrealty."

211.    By repeating the defamatory and misleading campaign narrative and amplifying it to her large follower base, Dana participated in the coordinated public pressure campaign aimed at coercing Plaintiff into giving a Get through harassment and reputational harm.

## XX.    DEFENDANT DEBORAH SHILOACH

212.    Defendant Deborah Shiloach owns and operates the Instagram account "@dshiloach," which had approximately 2,000 followers during the week of March 8, 2021.

213.    On or about March 8, 2021, Shiloach posted a screenshot of the Free Elizabeth chesed fund campaign, including the same image of Elizabeth Kairey and Plaintiff's minor daughter that was used across the campaign materials.

214.    Shiloach captioned the post with:"The crazy world we live in," thereby implying that Plaintiff's refusal to give a Get — which he contends was not lawfully required under halacha — constituted a societal outrage.

215.    Her publication and endorsement of the campaign contributed to the spread of defamatory content and the intensifying social pressure placed on Plaintiff, in furtherance of the broader conspiracy.

## XXI.    DEFENDANT SHERRY CHERA HALABI

216.    Defendant Sherry Chera Halabi owns the Instagram account "@spiaggiajewels," which had approximately 2,000 followers in March 2021.

217.    On or about March 8, 2021, Halabi posted a screenshot of the Free Elizabeth chesed fund campaign to her Instagram account.

218.    The post included the original campaign imagery, featuring the words "The Chesed Fund" and the photograph of Elizabeth Kairey and Plaintiff's daughter.

219.    Halabi captioned the post:

"This is not ok. Free Elizabeth now,"
thereby publicly endorsing the false narrative and helping to mobilize further community hostility and pressure against Plaintiff.

220.    Her actions contributed to the social media campaign of reputational coercion, which ultimately played a direct role in Plaintiff being compelled to give a Get under duress on March 11, 2021.

## XXII.  DEFENDANT DALIA OZIEL

221.   Defendant Dalia Oziel is a prominent social media influencer in the Orthodox Jewish community with an Instagram account under the handle "@daliaoziel," which had approximately 39,000 followers as of March 2021.

222.   On or about March 8, 2021, Oziel publicly posted a screenshot of the Free Elizabeth chesed fund campaign. Her post included the official campaign banner and a photo of Elizabeth Kairey with Plaintiff's minor daughter.

223.   The caption of Oziel's post read:

"TEARS OF JOY!!!!!! ELIZABETH IS FREED!!!!!!! MAY THIS BE THE FUTURE FOR ALL AGUNOS!!!!!!!!!!"
This statement celebrated the success of the coercive campaign while encouraging similar conduct in other cases.

224.   On March 11, 2021, Oziel hosted a live video on her Instagram account in which she was joined by Elizabeth Kairey and several other women. During the video, Kairey publicly thanked Oziel and the other participants for their roles in helping to secure the Get from Plaintiff.

225.   The tone of the video was celebratory, affirming that the harassment campaign had achieved its intended outcome. Oziel's central role in orchestrating public social media pressure was openly acknowledged and applauded by Kairey and others.

226.   Oziel's conduct materially contributed to the social media incitement, reputational injury, and psychological coercion that culminated in Plaintiff giving a Get under duress.

## XXIII. DEFENDANT EVA SHAMMAH

227.    Defendant Eva Shammah owns and operates the Instagram account "@evashammahrealty," which had approximately 8,500 followers at the relevant time. Her account is used primarily for business purposes related to real estate promotion and networking.

228.    On or about March 8, 2021, Shammah posted three separate screenshots of the Free Elizabeth campaign. These screenshots reflected the original defamatory content from the campaign's launch, which falsely accused Plaintiff of refusing to pay child support and waging a "relentless legal campaign" against Elizabeth Kairey.

229.    Shammah's post included the photo of Plaintiff's daughter and received approximately 457 likes, indicating substantial viewer engagement and support for the defamatory campaign.

230.    The caption of the post read: "Refusing a GET is abuse and it must stop. #freeelizabeth Link is in my bio to donate. Endorsed by Rabbi Eli Mansour. Please spread the word."

231.    In the comment section beneath Shammah's post, multiple users posted harassing and threatening remarks directed at Plaintiff and his family. For example: One user wrote: "Nobody should be using this boy's father. He is a pain management doctor. Nobody."\

232.    Another user, "gracemarcus1," commented:

"I think a group of sy moms should beat the shit out of him. With all due respect the rabbis can't do that. After he is beaten up let his father give him pain management."

233.    These comments remained publicly viewable and were neither disavowed nor removed by Shammah, who continued to host the post on her page long after the events in question.

234.    Shammah later confirmed to Plaintiff that she had spoken directly with Rabbi Eli Mansour before publishing the posts and that Mansour had personally endorsed the Free Elizabeth campaign and encouraged her to promote it online.

## XXIV. DEFENDANT RABBI HAROLD SUTTON

235.    Rabbi Harold Sutton is a respected rabbinic figure within the Orthodox Sephardic community. He holds the title of Dayan (rabbinical judge) and is widely viewed as a halachic authority by his followers.

236.    On or about March 11, 2021, the Free Elizabeth chesed fund campaign webpage listed Rabbi Harold Sutton as one of several rabbinic endorsers of the campaign, alongside Rabbis Eli Mansour, Max Sutton, and Tidhar Cohen.

237.    This webpage falsely accused Plaintiff of refusing to pay child support, disobeying a Beit Din ruling, and subjecting Elizabeth Kairey to years of abuse and legal aggression — none of which were true. These statements, amplified by rabbinic endorsements, were used to incite the community and justify illegal coercive tactics.

238.    Rabbi Sutton is a close personal friend of the Kairey family, including Elizabeth Kairey's father, and his support for the campaign was not grounded in an objective reading of halacha, but rather motivated by loyalty and bias.

239.    As a Dayan and public religious figure, Rabbi Sutton had a heightened duty to investigate before lending his name to a campaign involving a Get — an area of Jewish law that is highly sensitive and governed by strict halachic requirements regarding coercion.

240.    Instead, Rabbi Sutton recklessly or willfully ignored those halachic standards and allowed his name to be used to legitimize a public pressure campaign which involved illegal protests, public defamation, and online incitement.

241.    Plaintiff, Dibo Hafif, and Jonathan Abtan were each coerced into giving a Get under nearly identical conditions during this same campaign period. In Hafif and Abtan's cases, their Gets were later nullified by Rabbi Pinchos Rabinowitz due to the exact form of coercion now at issue. Yet Rabbi Harold Sutton, despite holding a title of Dayan, took no steps to investigate Plaintiff's case.

242.    His endorsement of the Free Elizabeth campaign played a material role in encouraging donations, legitimizing the harassment, and promoting the false narrative that Plaintiff was a halachic abuser. This endorsement led directly to Plaintiff's coercion and damages.

## XXV.  DEFENDANT RABBI MAX SUTTON

243.    Rabbi Max Sutton is a prominent rabbinic figure who holds the title of Rosh Beit Din Aram Soba in Jerusalem, Israel. He is a respected halachic authority within the Orthodox Syrian Jewish community and frequently lends rabbinic endorsements to campaigns and religious causes.

244.     On or about March 11, 2021, Rabbi Max Sutton's name appeared on the Free Elizabeth chesed fund webpage as one of the endorsing rabbis. The page falsely stated that Plaintiff refused to pay child support, defied a Beit Din, and subjected Elizabeth Kairey to years of abuse — all of which were demonstrably untrue.

245.     Rabbi Max Sutton is a blood relative of Elizabeth Kairey, and his endorsement was not the product of a neutral halachic ruling but rather a result of familial bias and loyalty. Upon information and belief, he did not conduct any independent investigation into the facts or halachic legitimacy of the campaign before lending his name.

246.     As a Dayan (rabbinical judge), Rabbi Max Sutton had a heightened responsibility to ensure that any support he gave was grounded in legitimate Jewish legal authority. No such authority was present here: no Beit Din authorized coercion, and no evidence of abuse or non-payment existed to justify the statements promoted on the campaign page.

247.     Following the Get ceremony on March 11, 2021 — which Plaintiff gave under duress — Rabbi Max Sutton, upon information and belief, publicly sanctioned Elizabeth Kairey's remarriage, despite having no halachic basis for doing so. He provided no psak din (halachic ruling), and failed to address the coercive environment in which the Get was given.

248.     Rabbi Sutton's post-Get actions demonstrate continuing ratification of the campaign's results, even though two similar Gets — given by Dibo Hafif and Jonathan Abtan — were later nullified by Rabbi Pinchos Rabinowitz on the grounds of illegal coercion and false pretenses. The coercive circumstances in Plaintiff's case were nearly identical.

249.     Rabbi Max Sutton's conduct was not limited to religious labeling or opinion. He endorsed a campaign that made objectively false factual claims — including that Plaintiff was abusive and had refused to pay child support — and gave those statements the imprimatur of rabbinic authority. These are verifiably false, defamatory statements that caused reputational damage and invited public harassment, and are not protected religious speech under the First Amendment.

## CLARIFYING NON-DEFENDANT RABBI TIDHAR COHEN

250.     Plaintiff acknowledges that Rabbi Tidhar Cohen, whose name also appeared on the Free Elizabeth webpage, is not being named as a Defendant in this action. Upon information and belief, Rabbi Cohen was pressured by senior Syrian rabbis to lend his name to the campaign under threat of professional consequences, including the potential loss of his rabbinic position. Rabbi Cohen has privately disclaimed voluntary endorsement of the campaign and expressed discomfort with its tactics. His inclusion here is for contextual completeness only.

## XXVI.     DEFENDANT RABBI YITZCHAK YISRAELI

251.     Rabbi Yitzchak Yisraeli is a Brooklyn-based Orthodox Jewish rabbi who regularly officiates Jewish divorce proceedings. On March 11, 2021, he served as the *mesader get* (officiant) for the Get ceremony between Plaintiff Elliot Hirsch and Elizabeth Kairey, which was conducted at the Brooklyn home of a third party.

252.     The ceremony occurred against the backdrop of an aggressive and widely publicized pressure campaign designed to compel Plaintiff to issue a Get. That campaign included mass protests outside Plaintiff's home and business, targeted harassment on social



media, threats of violence, defamatory statements, and communal ostracism. These events were widely covered across social media and Orthodox Jewish community channels.

253.    Rabbi Yisraeli was aware, or should have been aware, of this pressure campaign at the time he agreed to officiate. In fact, multiple other rabbis who were asked to preside over the Get declined to do so, including Rabbi Asher Hatchuel, who expressly stated that he would not officiate because the circumstances rendered any resulting Get invalid under halacha.

254.    Rabbi Yisraeli proceeded with the Get ceremony despite these concerns. During the ceremony, Plaintiff, following protocol, verbally affirmed his willingness to give the Get. However, under Jewish law, such a verbal statement does not validate a Get that is, in reality, the product of external coercion. If a husband later informs the officiating rabbi that he was coerced, the rabbi is halachically obligated to investigate the matter and, if warranted, nullify the Get.

255.    Rabbi Yisraeli was paid $2,000 for officiating the Get ceremony. This amount is substantially higher than the standard rate typically charged by rabbis for such services and reflects the high-profile nature of the event and the urgency placed upon its completion by Elizabeth Kairey's supporters.

256.    In the hours following the ceremony, Plaintiff fulfilled his halachic obligation by reaching out to Rabbi Yisraeli and informing him that the Get had been delivered under extreme duress and pressure. This notification is recognized in Jewish law as a critical step that triggers the officiating rabbi's responsibility to investigate the circumstances surrounding the Get.

257.    IPlaintiff's attempt to alert Rabbi Yisraeli was in stark contrast to the actions of other rabbis who took their halachic responsibilities seriously. Notably, Rabbi Pinchos

Rabinowitz — a respected rabbinical authority — presided over the Gets of two other men, Dibo

Hafif and Jonathan Abtan, who were subjected to the same coordinated campaign of public

pressure, protests, and harassment during the same week in March 2021. After learning that

those Gets had been given under coercion and false pretenses, Rabbi Rabinowitz conducted an

investigation and subsequently nullified both Gets on the grounds that they were invalid under

Jewish law. Rabbi Yisraeli, by contrast, ignored Plaintiff's notice and failed to take any steps to

investigate or correct the outcome, despite the nearly identical circumstances.

258.    Rabbi Yisraeli continues to retain the physical Get document that he drafted and

presided over. Plaintiff has made requests for its return, as it was delivered involuntarily and

remains Plaintiff's property. Despite these demands, Rabbi Yisraeli has failed or refused to return

the document.

## XXVII.    DEFENDANT CITY OF NEW YORK

259.    The New York City Police Department, operating under the authority of the City

of New York, had prior knowledge of the illegal and coercive protests that targeted Plaintiff and

others in March 2021. These included unpermitted gatherings that escalated into violent riots

outside the home of Mr. Dibo Hafif on March 9 and 10, 2021, and a planned protest against

Plaintiff scheduled for March 11, 2021.

260.    On both March 9 and March 10, 2021, NYPD officers from the 61st Precinct

arrived at Mr. Hafif's home at 2136 East 5th Street in Brooklyn, where crowds of over 150 —

later 1,000 — people had gathered, chanting, throwing eggs and rocks, and vandalizing private

property, including air conditioning units. The officers took a report and left without making

arrests or dispersing the crowd, thereby enabling and effectively endorsing the continuation of unlawful activity.

261.    On March 11, 2021, an illegal protest was staged at Corporal Wiltshire Park in Brooklyn, directly targeting Plaintiff. Despite receiving prior notice, NYPD failed to meaningfully intervene or prevent the gathering. Only one unstaffed patrol car was sent to the scene. The protest, led in part by Laurie Beda, featured signs, loudspeakers, and explicit threats to escalate unless Plaintiff gave a Get.

262.    In contrast, the Ocean Township Police Department in New Jersey quickly responded and dispersed a similar protest when it was staged outside Plaintiff's Oakhurst residence that same week. The different responses underscore a pattern of selective enforcement on the part of the NYPD.

263.    This pattern is further evidenced by the NYPD's aggressive responses to recent unrelated protests, including pro-Palestine and counter-protests near Congregation Shaare Zion in April 2025 and at CUNY Brooklyn College in May 2025.

264.    At those events, NYPD officers arrived in large numbers, made arrests, and disbanded the demonstrations — even when they were less destructive than the Get-related riots described here.

265.    The NYPD's failure to act in March 2021 was due in part to the influence of the Shomrim patrol group, a private Orthodox Jewish security organization with strong political and social ties to the 61st Precinct.

266.    NYPD Officer Richie Taylor, a community liaison officer, was seen coordinating with protestors and appeared on video near the scene of the riots without taking enforcement action.

267.    This coordination between public officials and private actors allowed the Get-coercion campaign to escalate unchecked, and exposed Plaintiff to severe harassment and imminent physical danger.

268.    The City's policies, customs, and practices — including its deference to Shomrim and failure to enforce the law equally — directly contributed to Plaintiff's constitutional injuries.

## XXVIII.    DEFENDANT MICHELLE AMSELLEM

269.    Michelle Amsellem is a citizen of the State of Maryland, and is the ex-wife of Jonathan Abtann, one of the men subjected to the same coercive Get campaign that targeted Plaintiff and others, including Dibo Hafif.

270.    On or about March 9 through March 11, 2021, Michelle Amsellem actively participated in the Free Elizabeth campaign, using her Instagram platform to promote the campaign and urge public action. She appeared in one or more Instagram live videos with Defendant Abraham Manopla, in which she encouraged viewers to protest outside the homes of Get refusers, including Plaintiff.

271.    In these live broadcasts and posts, Michelle Amsellem referred to Plaintiff, Dibo Hafif, and her own husband, Jonathan Abtan, as "abusers," and urged her followers to circulate the Free Elizabeth campaign to maximize public pressure and participation in the illegal protests.

272.    Michelle Amsellem's comments contributed directly to the online amplification of the campaign, including the spread of false, defamatory accusations. By invoking her personal experience and promoting the campaign as a broader social justice mission, she materially supported the actions that ultimately led to unlawful coercion and reputational harm.

## XXIX. DEFENDANT ABRAHAM MANOPLA (FEDERAL CLAIMS ONLY)

273.    Abraham Manopla is a citizen of the State of New Jersey and is not subject to any state law causes of action in this Complaint. He is named solely in connection with Plaintiff's federal civil RICO claims pursuant to 18 U.S.C. § 1962(c)–(d).

274.    On March 8, 2021, while physically located in Mexico City, Manopla received and reviewed the "Free Elizabeth" Chesed Fund campaign page. Immediately thereafter, he began orchestrating and amplifying a cross-border campaign of extortion and harassment via social media, particularly Instagram.

275.    That day, using his account "@mexicanpacino0528," Manopla launched a series of Instagram Live broadcasts in which he hosted multiple speakers, including Evet Hafif, Jen Braha Saffati, and others, to incite large-scale harassment and violence against Plaintiff and Dibo Hafif. These broadcasts included explicit instructions to riot, public disclosures of home addresses, and calls for crowd-based pressure to compel the issuance of religious Jewish divorce documents (Gets). Manopla explicitly stated the goal was to "force" both men to give a Get. He identified the home of Dibo Hafif at 2136 East 5th Street and urged viewers to gather there and engage in aggressive actions. His guests — including Ms. Saffati — made statements encouraging physical violence against Plaintiff.

276.    Over March 8–11, 2021, Manopla live streamed multiple planned and unlawful protests, including the riot outside Hafif's home on March 9 and 10, and the planned protest outside Plaintiff's home on March 10 in Oakhurst, NJ. Protestors threw rocks and eggs, trespassed on private property, and vandalized cars. These activities were broadcast to thousands of followers on Instagram, generating massive reach and social pressure. During the March 10 protest outside Plaintiff's home, Manopla featured a livestream guest who was physically present at the scene. A police officer from the Ocean Township Police Department intervened to disperse the protest and told Manopla directly that the event was not peaceful and must end. This footage was streamed in real time to over 1,600 viewers, with thousands more watching the recordings afterward.

277.    In each livestream, Manopla pinned links to solicit monetary donations for his personal "reading" initiative, thereby financially benefiting from the campaign. These funds were solicited in connection with, and on the heels of, his organized efforts to coerce private religious action through public harassment and defamatory speech. Manopla openly stated that he was acting under the rabbinic endorsement of Defendant Rabbi Eli Mansour, and claimed to be coordinating efforts to "finish the job" of extracting Gets from Plaintiff and others. He stated this pressure campaign would continue until "every man" gives in, and acknowledged during one broadcast that no normal human being could withstand this level of targeted attack.

278.    On March 11, 2021, during the final Get extraction effort against Plaintiff, Manopla continued broadcasting live updates from community members, encouraging thousands of viewers to pressure Plaintiff throughout the day. He threatened a new round of protests that evening at both Plaintiff's Brooklyn and Oakhurst addresses if the Get was not delivered. Plaintiff ultimately gave the Get that night under duress.

**XXX.    DEFENDANT MURRAY BETESH (FEDERAL CLAIMS ONLY)**

279.    Murray Betesh is a citizen of the State of New Jersey and is named exclusively in connection with Plaintiff's federal civil RICO claims under 18 U.S.C. § 1962(c)–(d). No state law claims are asserted against him in this action. Murray Betesh collaborated with Abraham Manopla as a promoter and co-organizer of the coercive protest campaign. He appeared as a frequent guest on Manopla's live streams, endorsed the riots, and repeatedly encouraged his approximately 5,000 Instagram followers to target Plaintiff with public humiliation and protest action.

280.    On March 10, 2021, Betesh physically appeared on 7 Saxony Drive — Plaintiff's residential street in Oakhurst, NJ — during the illegal protest that took place that night. Though he has no connection to that neighborhood, he attended specifically to observe and document the event and broadcast it publicly.

281.    Betesh took video footage of the protestors, police response, and street activity. This footage was later posted or shared on social media to further amplify the campaign and intimidate Plaintiff. His actions were part of the coordinated effort to sustain public pressure and incite further targeting of Plaintiff.

282.    Betesh worked closely with Manopla and others in the weeks following the protest, branding themselves as "Get Busters" — a self-declared group devoted to extracting Gets from Orthodox men through coercive social tactics.

## FIRST CAUSE OF ACTION- VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C.

## § 1983

**(Against Defendants Heshy Tischler, Amber Adler, and the City of New York)**

283.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

284.    Under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, causes the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the injured party.

285.    Defendants Amber Adler and Heshy Tischler, while running for New York City Council, used their official political platforms to promote, endorse, and lead a public campaign of harassment and coercion against Plaintiff, including illegal protests outside residences and institutions. Their conduct was undertaken under color of law, as they invoked their official status and campaign authority in support of the events.

286.    Both Adler and Tischler made public statements invoking their candidacies and pledging to criminalize the refusal to provide a Jewish divorce (a Get), using legislative threats as leverage. These statements and actions were intended to and did exert government-influenced pressure to coerce Plaintiff's private religious decision.

287.    Adler and Tischler also participated in and incited illegal protests, including the March 11, 2021 protest near Plaintiff's father's medical office and in proximity to Plaintiff's New York residence. These protests were unpermitted, involved amplified sound, and included signs threatening violence and reputational harm. Both individuals used Instagram and other

public campaign platforms to broadcast and amplify these events in connection with their political identities.

288.    Defendant City of New York, acting through the New York City Police Department and officers of the 61st Precinct, responded to the above protests but declined to enforce laws typically applied to similar public demonstrations, such as dispersal orders, citations for noise violations, or arrests for trespass and property damage.

289.    The NYPD's failure to act — despite having actual and repeated notice of threats, physical damage, and clear violations of the law — amounted to deliberate indifference and selective enforcement. This conduct directly contributed to the coercive environment that deprived Plaintiff of his constitutional rights under the First and Fourteenth Amendments.

290.    On March 9 and March 10, 2021, the NYPD responded to illegal protests outside the Brooklyn residence of another target, Dibo Hafif, located at 2136 East 5th Street. Officers observed large crowds assembling, blocking street traffic, honking horns in violation of city noise ordinances, and surrounding the home in a manner that effectively prevented Hafif and his family members from exiting the premises. Although a group of five officers initially arrived and took a police report, they left the scene without issuing dispersal orders or making any arrests. Following their departure, the situation escalated dramatically. The crowd, which eventually swelled to over 1,000 individuals, began engaging in violent and destructive behavior — including trespassing onto Hafif's property, vandalizing his air conditioning units, and throwing eggs at the home. Only one visibly overwhelmed NYPD officer remained in the area during the height of the disturbance, and no further enforcement action was taken. This grossly inadequate response constituted a deliberate failure to intervene in an ongoing riot, and stands in stark contrast to how NYPD has handled protests in other contexts.

291.    On March 11, 2021, another illegal protest occurred near Plaintiff's father's medical practice in Brooklyn, located at 2136 Ocean Avenue. NYPD placed a single patrol vehicle nearby, but the car was unstaffed and no action was taken to stop or control the protest. Protestors used loudspeakers, displayed threatening signs, and announced their intent to escalate to Plaintiff's family's home the following day. Despite lacking permits and violating multiple city ordinances, no enforcement measures were taken.

292.    These examples reflect a pattern of inaction by NYPD — particularly by officers assigned to the 61st Precinct — that emboldened protestors and signaled official tolerance of the campaign against Plaintiff. The selective enforcement stands in contrast to how the NYPD has recently responded to politically charged protests involving other communities, where officers have rapidly dispersed crowds and made arrests.

293.    For example, in April 2025, NYPD arrested dozens of protesters at CUNY-Brooklyn College for participating in a pro-Palestinian demonstration.[1] In late April and again in May 2025, NYPD riot control units were deployed outside Congregation Shaare Zion in Brooklyn in response to protests between Israel and Palestine supporters.[2] Those demonstrations were met with rapid police intervention, threats of arrest, and dispersal orders.

294.    By contrast, no such measures were taken during the Get-related protests outside Plaintiff's residence or that of others such as Dibo Hafif. In both cases, substantial property damage occurred and officers failed to intervene. The NYPD's decision to respond passively —

---

[1] https://www.nytimes.com/2025/05/08/nyregion/protest-brooklyn-college-arrests.html
[2] https://nypost.com/2025/04/27/us-news/cops-clash-with-anti-israel-protesters-outside-nyc-synagogue-where-israeli-minister-was-set-to-speak-before-event-canceled/

or not at all — enabled the protests to escalate and directly contributed to the coercion Plaintiff suffered.

295.    The NYPD's tolerance of the anti-Get protests was not based on a lack of awareness or inability to respond. Rather, it reflected preferential treatment for protestors affiliated with the Syrian Jewish community, including the Shomrim patrol group, which has historically maintained close ties with NYPD leadership and political officials. NYPD Community Affairs officer Richie Taylor was also in contact with protestors and failed to intervene meaningfully.

296.    On March 9 and 10, 2021, several members of the Shomrim neighborhood patrol were present at the protest and riot outside Dibo Hafif's home, which the NYPD permitted to continue despite obvious violations of law. These protestors encouraged violence and destruction while NYPD and Shomrim personnel stood by. Their presence signaled coordination between community insiders and law enforcement, contributing to Plaintiff's sense of fear and helplessness.

297.    The March 11, 2021 protest was poised to escalate. Defendant Elisheva Yarimi publicly warned on Instagram that with Hafif in jail, the crowd would next descend on Plaintiff's parents' residence in Brooklyn — where Plaintiff frequently stayed with his daughter during visitation. That night, a single NYPD vehicle was seen parked outside Plaintiff's parents' home, indicating the NYPD's awareness of a planned escalation. Plaintiff gave the Get under extreme duress that evening to prevent that riot from taking place.

298.    The acts and omissions of Defendants Amber Adler, Heshy Tischler, and the City of New York, acting through the New York City Police Department and its 61st Precinct, resulted

in clear violations of Plaintiff's constitutional rights. Specifically, Plaintiff was deprived of his rights under the First Amendment to the United States Constitution, including the right to freely exercise his religion and to be free from government-compelled religious expression, by being coerced into performing a religious act — the issuance of a Get — under threat of escalating public harassment enabled and endorsed by actors invoking governmental authority.

299.    Plaintiff was further deprived of his rights under the Fourteenth Amendment, including equal protection under the law, due to the NYPD's deliberate indifference and selective enforcement in response to unpermitted and violent protests organized against him, while similar protests by other groups have been promptly suppressed. These constitutional deprivations were effected under color of law and constitute actionable civil rights violations pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

### Violation of Civil Rights – Conspiracy to Interfere with Civil Rights

### 42 U.S.C. § 1985(3)

**(Against Defendants Rabbi Eli J. Mansour, Rabbi Harold Sutton, Rabbi Max Sutton, Elizabeth Kairey, Laurie Beda, Adina Miles, Heshy Tischler, Amber Adler, Elisheva Yarimi, Nourite Maimon, Isabella Khaimov, Eva Shammah, Miriam Sabzehroo, Raquel Sabzehroo, Abraham Manopla, members of Shomrim, and the City of New York)**

300.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

301.    Under 42 U.S.C. § 1985(3), it is unlawful for two or more persons to conspire to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

302.    The Defendants named in this cause of action knowingly and willfully participated in a wide-reaching and organized campaign to publicly pressure, intimidate, and coerce Plaintiff into providing a Get — a Jewish divorce — under threat of reputational, financial, and physical harm.

303.    Rabbi Eli J. Mansour spearheaded the religious legitimization of this conspiracy. His early endorsement of the "Free Elizabeth" campaign gave the initiative credibility and reach. He participated in strategic conversations, supported protest activity, and appeared on video declaring that "our work is not done," and that the campaign would continue to target other men.

304.    Rabbi Harold Sutton and Rabbi Max Sutton also appeared as rabbinic endorsers of the "Free Elizabeth" campaign, knowing that their rabbinic and judicial status would be used to encourage communal participation and suppress opposition. Max Sutton reportedly sanctioned Elizabeth Kairey's remarriage, despite knowing that the Get was obtained under coercion — and without any halachic (Jewish legal) basis. Their involvement was rooted not in religious necessity but in close family ties to Elizabeth Kairey and her father, Ikey Kairey, demonstrating bias and a willingness to misuse their rabbinic roles.

305.    Elizabeth Kairey provided content for the campaign webpage, shared a photograph of herself and the couple's child, and coordinated with the organizers. She continued to participate in the events despite being notified that threats, violence, and harassment were being committed in her name.

306.    Laurie Beda, Kairey's aunt, organized and led physical protests, published inflammatory content online, and helped coordinate harassment against Plaintiff and his family, including phone calls and defamatory reviews targeting Plaintiff's father's business.

307.    Adina Miles used her social media influence to mobilize crowds and explicitly threaten ongoing harassment against Plaintiff unless a Get was provided. She boasted about the campaign's success and promised future campaigns would "publicly humiliate" and "have [men] fired from their jobs."

308.    Heshy Tischler and Amber Adler each promoted and led the protests using their official campaign platforms while running for New York City Council. They tied the success of the campaign to their political efforts, pledged to support legislation criminalizing Get refusal, and used loudspeakers and signs saying "No Get, No Peace" — directly invoking state power to advance the coercion.

309.    Elisheva Yarimi, Nourite Maimon, Eva Shammah, and Isabella Khaimov all made public threats, incited protests, and used social media to shame and pressure Plaintiff. Yarimi specifically announced that, following Hafif's arrest, the mob would move to Plaintiff's parents' house. Khaimov and Shammah repeatedly cited Rabbi Mansour's endorsement to justify their involvement.

310.    Miriam and Raquel Sabzehroo (Community.News) used their popular Instagram page to promote the campaign, circulate protest logistics, and validate the claims of abuse and financial neglect against Plaintiff — all based on unverified and defamatory statements.

311.    Abraham Manopla coordinated real-time protest communications through Instagram Live. He brought on guests who incited violence and broadcast protest locations,

including urging his audience to go to Plaintiff's home. He also solicited donations while playing a central media role in the conspiracy.

312.    Multiple members of Shomrim, a neighborhood patrol organization deeply embedded in the Brooklyn Syrian Jewish community, were physically present during the illegal and violent protest activity outside Dibo Hafif's home. Rather than dispersing or discouraging unlawful conduct, they stood by and helped coordinate with law enforcement.

313.    The City of New York, acting through the New York Police Department and specifically officers of the 61st Precinct, was a knowing participant in the conspiracy. NYPD officers were physically present at multiple illegal protests where they witnessed property destruction, trespass, and riotous behavior — including rocks and eggs thrown at Hafif's home and trespassers tampering with private air conditioning units. NYPD took no meaningful enforcement action. They left scenes of ongoing riots, dispatched only token patrols, and created an environment of state-backed immunity for the perpetrators.

314.    The NYPD's inaction was not passive. It was deliberate and discriminatory, based on influence from community groups like Shomrim and political pressure from Defendants Tischler and Adler. Community Affairs Officer Richie Taylor, known for his ties to the Syrian Jewish community, was also involved in managing communications with protestors but took no effective steps to deter the escalating threats.

315.    Together, these Defendants shared a common unlawful objective: to intimidate and coerce Plaintiff — and others similarly situated — into complying with extrajudicial communal pressure using threats, defamation, and mass intimidation. Each acted with the knowledge of the overarching goal and took steps to advance it.

316.    The conspiracy was motivated in part by invidious discriminatory animus based on Plaintiff's sex and perceived disobedience of religious norms. The means used — including false public accusations, mob coercion, destruction of property, and state-enabled threats — deprived Plaintiff of equal protection of the laws and freedom of religious choice.

317.    As a result of this unlawful conspiracy, Plaintiff suffered severe emotional distress, reputational harm, religious coercion, and loss of dignity and liberty.

## THIRD CAUSE OF ACTION – VIOLATION OF 42 U.S.C. § 1986

318.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

320.    Under 42 U.S.C. § 1986, every person who has knowledge of a conspiracy under 42 U.S.C. § 1985(3) and who has the power to prevent or aid in preventing the commission of the same, but neglects or refuses to do so, shall be liable to the injured party for all damages caused by such wrongful acts.

321.    The conspiracy to coerce Plaintiff into giving a Get was widely publicized and supported through social media, fundraising campaigns, and public protests. Each of the following Defendants had actual knowledge of the conspiracy's existence and goals and either contributed to or failed to take action to prevent it.

322.    Rabbi Eli J. Mansour endorsed and authorized the "Free Elizabeth" campaign, permitted his name to be published on the Chesed Fund page, encouraged further protest and pressure, and coordinated with others to extract a Get from Plaintiff.

323.    Elizabeth Kairey helped create the campaign, supplied the content, allowed photos of herself and Plaintiff's daughter to be used, and participated in celebratory videos after the Get was given.

324.    Amber Adler and Heshy Tischler incited illegal protests, used campaign platforms to promote legislative threats, and personally appeared at demonstrations calling for the extraction of a Get from Plaintiff.

325.    Adina Miles used her large social media following to organize protests, call for Plaintiff's professional destruction, and publicly threatened further action unless Plaintiff complied.

326.    Laurie Beda and Norma Tawil coordinated protests, encouraged public intimidation, and led gatherings with explicit threats to escalate the campaign to Plaintiff's family and place of business.

327.    Elisheva Yarimi used loudspeakers to threaten continuous protest and posted plans to shift demonstrations to Plaintiff's parents' home.

328.    Nourite Maimon and Eve Scaba appeared on live streams calling for continued pressure and public shaming of Plaintiff.

329.    Community.News (Miriam and Raquel Sabzehroo), Eva Shammah, Sari Dana, Deborah Shiloach, Sherry Chera Halabi, Dalia Oziel, Isabella Khaimov, and others widely circulated defamatory material and mobilized community participation in the campaign.

330.    The Yeshiva of Flatbush, through Ariella Stavrach Falack, sent students to an illegal protest and rewarded them with official school credit, thereby validating the coercive campaign.

331.    Rabbi Harold Sutton and Rabbi Max Sutton publicly endorsed the campaign, lent rabbinic authority to the coercive efforts, and continued to support Elizabeth Kairey's remarriage despite knowing the Get was coerced.

332.    Rabbi Yitzchak Yisraeli served as the officiant (mesader get) at the coerced Get proceeding. He was contacted by Rabbi David Ozeri and others closely connected to Kairey and knew of the protests and pressure being exerted on Plaintiff.

333.    Rabbi Yisraeli accepted payment of approximately $2,000 to officiate the Get and chose to proceed despite the obvious duress Plaintiff was under. Had he declined to officiate — as prior rabbis had done — the conspiracy would have been halted. His actions enabled its completion.

334.    Plaintiff promptly informed Rabbi Yisraeli after the Get that it had been given under coercion. Under Jewish law and ethical obligation, Rabbi Yisraeli should have investigated and acted. He failed to do so.

335.    Whether or not Rabbi Yisraeli's inaction violated Jewish religious law is not dispositive here. His liability under § 1986 arises from the fact that he had knowledge of the conspiracy, had the power to stop it by refusing to officiate, and failed to act.

336.    The City of New York also had notice and the ability to prevent the coercive protests. NYPD officers failed to enforce laws, declined to disperse illegal crowds, and permitted

property damage and reputational harm. This non-enforcement reflected institutional tolerance that further enabled the campaign.

337.    Each of these Defendants had the authority, means, or influence to halt the conspiracy or mitigate its effects. None took meaningful action.

338.    Their inaction allowed the conspiracy to succeed and directly contributed to the violation of Plaintiff's constitutional rights.

339.    Accordingly, Defendants named herein are liable under 42 U.S.C. § 1986 for having knowledge of the unlawful conspiracy, the power to prevent it, and failing to do so.

## FOURTH CAUSE OF ACTION

## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)

**(Against Defendants Elizabeth Kairey, Rabbi Eli J. Mansour, Rabbi Harold Sutton, Rabbi Max Sutton, Abraham Manopla, Murray Betesh, Adina Miles, Amber Adler, Heshy Tischler, Laurie Beda, Edmond J. Safra Synagogue Inc., and others identified below)**

340.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

341.    Under 18 U.S.C. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

342.    Each Defendant named in this cause of action knowingly agreed to and did conduct or participate in the affairs of an associated-in-fact enterprise (hereinafter, "the Free Elizabeth Enterprise"), the purpose of which was to force Plaintiff, Elliot Hirsch, to issue a Jewish religious divorce (a "Get") through coercion, intimidation, public shaming, and fraudulent fundraising under the pretense of religious activism.

343.    The Enterprise functioned through coordinated efforts via WhatsApp, Instagram, and other online platforms, alongside real-world planning and execution of unlawful protests. Each participant assumed a specific role in furtherance of the coercive and fraudulent campaign.

344.    The Enterprise's activities affected interstate commerce, as the protests spanned multiple states (New York and New Jersey), utilized internet communications and payment platforms, and solicited donations from across state lines.

345.    Defendants committed numerous predicate acts constituting "racketeering activity" as defined by 18 U.S.C. § 1961(1), including but not limited to:

Predicate Acts of Wire Fraud (18 U.S.C. § 1343):

346.    Defendants Elizabeth Kairey, Rabbi Eli J. Mansour, Rabbi Harold Sutton, Max Sutton, and Edmond J. Safra Synagogue Inc. published and maintained a public fundraising page falsely accusing Plaintiff of refusing child support, waging a legal war against his wife, and disobeying religious authorities.

347.    In furtherance of this scheme, Defendants repeatedly utilized interstate wires — including the creation and mass dissemination of the "Free Elizabeth" Chesed Fund campaign hosted online. Each time that campaign was accessed and a donation was made through its digital platform, a separate use of the wires occurred. Each such transmission constitutes an

individual predicate act of wire fraud under 18 U.S.C. § 1343. The campaign generated more than 1,000 donations, and was repeatedly shared and amplified via social media posts, emails, and website links, each of which furthered the fraudulent scheme by encouraging reliance on false statements about Plaintiff. These included knowingly false allegations of abuse, refusal to pay child support, and refusal to comply with rabbinic orders — all used to elicit emotional and financial support under fraudulent pretenses.

348.    Thousands of people viewed and donated to this campaign, which generated over $128,000 in funds that ultimately financially benefited Defendant Kairey and were used to fund ongoing litigation against Plaintiff.

349.    Defendants Laurie Beda, Adina Miles, Amber Adler, Heshy Tischler, Community News (Miriam and Raquel Sabzehroo), Isabella Khaimov, and Eva Shammah promoted this false information through their own social media accounts, thereby amplifying the fraud.

Predicate Acts of Extortion (in violation of the Hobbs Act, 18 U.S.C. § 1951 and NY Penal Law §§ 155.05, 155.30):

350.    Defendants Adina Miles, Abraham Manopla, Amber Adler, Heshy Tischler, Elisheva Yarimi, Nourite Maimon, Eve Scaba, and others led or co-led physical protests outside Plaintiff's home in New Jersey, outside his father's office in Brooklyn, and threatened to escalate to Plaintiff's parents' home later that night.

351.    These protests included threats of further harassment, reputational harm, and even physical damage to property (e.g., the Hafif protests involved egg-throwing, destruction of AC units, and trespassing).

352.    Manopla and Betesh, operating from New Jersey, coordinated the logistics of the protests via livestreams and Instagram Lives that reached tens of thousands of viewers, instructing them to join the pressure campaign.

353.    These actions were taken with the intent to instill fear and force Plaintiff to surrender a religious divorce document, which constitutes property and holds substantial personal and religious value.

Open-Ended Continuity:

354.    The Enterprise is not a closed-ended operation. Since the events targeting Plaintiff, Defendants Adina Miles, Amber Adler, Khaimov and others have continued similar campaigns targeting additional men, including Dibo Hafif, Jonathan Abtan, Itzhak Rubinov and Jonathan Benamou.

355.    Hafif and Abtan also gave Gets under coercion in March 2021; their Gets were later nullified by Rabbi Pinchos Rabinowitz for coercion and false pretenses.

356.    Rubinov, Benamou and Hafif have since filed civil suits in the Eastern District of New York: *Rubinov v. Miles*, No. 24-CV-04375 (NCM) (LB), *Benamou v. Miles*, No. 1:25-cv-02532, *Hafif v. Mansour Et Al*, 1:22-cv-01199.

357.    These continuing efforts illustrate an ongoing scheme of similar character and intent, posing a threat of future criminal conduct.

Roles of Individual Defendants:

358.    Rabbi Eli Mansour spearheaded the campaign by giving it religious legitimacy. He endorsed the fraudulent fundraising page, communicated directly with protest leaders, and appeared at celebratory events, acknowledging his coordination with activists.

359.    Elizabeth Kairey supplied the narrative, including false claims about Plaintiff, directed the inclusion of private photos on the webpage, and benefited financially.

360.    Harold and Max Sutton, both respected rabbinical figures with close ties to Kairey, placed their names on the web page in religious endorsement, enabling the fraud to succeed. Max Sutton further authorized Kairey to remarry based on the coerced Get, despite its invalidity.

361.    Rabbi Yisraeli, the officiant of the Get, proceeded with the ceremony despite knowing the surrounding coercion, accepted a $2,000 fee, and failed to investigate after Plaintiff notified him of the coercion. His failure to halt the ceremony or later invalidate the Get allowed the scheme to succeed.

362.    Laurie Beda, Community News (Miriam and Raquel Sabzehroo), Eva Shammah, Isabella Khaimov, and Sherry Halabi, among others, served as online promoters and enforcers of the scheme — spreading falsehoods and mobilizing community participation.

363.    Each Defendant either committed two or more predicate acts personally or aided and abetted others who did so as part of the coordinated enterprise.

364.    As a direct and proximate result of Defendants' RICO violations, Plaintiff suffered significant harm, including but not limited to: the coerced issuance of a religious document (the Get); reputational damage and defamation; emotional distress and public humiliation; financial losses stemming from litigation funded through the fraudulent campaign;

and the loss of a unique religious and personal property interest in the Get. Additionally, funds raised through the fraudulent "Free Elizabeth" campaign were used by Defendant Elizabeth Kairey to retain legal counsel and continue prosecuting her civil divorce action against Plaintiff in Kings County Supreme Court. This enabled her to obtain a monetary judgment of over $100,000 against Plaintiff. But for the Defendants' wire fraud and extortion, Kairey would not have had the financial means to sustain that litigation or secure such a judgment. That judgment remains in effect and has caused Plaintiff further tangible injury, including obstructing his admission to the New Jersey Bar. The New Jersey Board of Bar Examiners has cited this outstanding judgment as a barrier to Plaintiff's professional licensure, inflicting additional and ongoing harm to his livelihood and career.

365.    Plaintiff seeks treble damages, attorneys' fees, and all other relief available under 18 U.S.C. § 1964(c).

## FIFTH CAUSE OF ACTION

## Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d)

**(Against Defendants Elizabeth Kairey, Rabbi Eli J. Mansour, Rabbi Harold Sutton, Rabbi Max Sutton, Abraham Manopla, Murray Betesh, Adina Miles, Amber Adler, Heshy Tischler, Laurie Beda, Edmond J. Safra Synagogue Inc., and other co-conspirators)**

366.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

367.    Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of the RICO statute. A conspiracy under §

1962(d) does not require that each conspirator personally commit two predicate acts — only that they agreed to facilitate the racketeering conduct of the enterprise.

368.    Each of the Defendants named in this cause of action agreed — either explicitly or tacitly — to participate in the affairs of the "Free Elizabeth Enterprise" through a pattern of racketeering activity. The Enterprise's goal was to extract a Get from Plaintiff, Elliot Hirsch, through coordinated coercion, intimidation, and fraud.

369.    The conspiracy included unlawful fundraising, dissemination of false statements, public shaming, physical protests, threats of violence and reputational harm, and mobilization of social pressure using religious, community, and political influence. Defendants knew that these activities were designed to induce fear, public pressure, and reputational ruin, all to compel Plaintiff's compliance.

370.    Each Defendant took on a specific role in furtherance of the scheme:

371.    Elizabeth Kairey provided the narrative and personally benefited from the proceeds and outcome.

372.    Rabbi Eli J. Mansour legitimized the campaign and directly coordinated with protest leaders.

373.    Harold and Max Sutton endorsed the coercive campaign under rabbinic authority, lending it religious weight and credibility.

374.    Abraham Manopla and Murray Betesh, based in New Jersey, used social media livestreams to direct thousands of followers to engage in physical protests, doxxing, and harassment.

375.    Adina Miles, Amber Adler, and Heshy Tischler, all prominent public figures, organized and participated in illegal demonstrations while using their platforms to incite further public outrage and support for coercion.

376.    Laurie Beda and other community leaders used public forums to plan and escalate harassment campaigns, including threats of escalating protests and pressure.

377.    Edmond J. Safra Synagogue Inc. created and hosted the Chesed Fund page under its name and control, enabling mass dissemination of falsehoods and collection of funds under fraudulent pretenses.

378.    Defendants communicated and coordinated through social media, WhatsApp groups, Instagram livestreams, emails, and real-world meetings. Each conspirator was aware of the unlawful nature of the scheme and agreed, either by words or actions, to participate in its advancement.

379.    Defendants were further aware that multiple victims were being targeted as part of this ongoing enterprise. Plaintiff has alleged facts showing the same coordinated tactics were deployed against Dibo Hafif, Jonathan Abtan, Itzhak Rubinov, and Jonathan Benamou, all of whom were pressured into giving Jewish divorces under similar public coercion. This shared intent to pressure multiple individuals through sustained, unlawful tactics satisfies the pattern and continuity requirements of RICO conspiracy.

380.    Defendants' conduct extended beyond a singular episode. The campaign against Plaintiff was part of a broader movement, endorsed and supported by the Defendants, that persisted over time and continued after Plaintiff's coerced Get was extracted. The acts against

Plaintiff were not isolated, but part of a recurring strategy to impose extrajudicial pressure and extract religious compliance.

381.    As part of the conspiracy's foreseeable consequences, Plaintiff sustained not only emotional and reputational harm, but direct and substantial financial injury traceable to Defendants' coordinated conduct. The funds fraudulently raised through the Free Elizabeth campaign — which were amplified and legitimized through Defendants' unified efforts — were used by Defendant Kairey to finance ongoing litigation against Plaintiff, including the retention of counsel, the filing of legal motions, and the eventual entry of a judgment exceeding $100,000 in her favor in New York Supreme Court. That judgment has materially impaired Plaintiff's professional trajectory, including obstructing his admission to the New Jersey Bar, where the judgment is being cited by the Board of Bar Examiners as a ground for denial. This harm is a direct and proximate result of Defendants' participation in a racketeering enterprise, and exemplifies the real-world financial consequences of their unlawful agreement.

382.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, attorneys' fees, and all other appropriate relief as permitted by law.

## SIXTH CAUSE OF ACTION-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

383.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "381" herein with the same force and effect as if the same were set forth at length herein.

384.     Each Defendant engaged in conduct with actual malice and deliberately intended to cause me such severe emotional distress. Their actions were not merely negligent or reckless, but purposeful, targeted, and sustained.

385.     Each Defendant encouraged, incited, and supported threats of violence directed at me with the express goal of inflicting emotional trauma so intense that no reasonable person could be expected to endure it.

386.     The aforementioned Free Elizabeth webpage was created, disseminated, and circulated not just to raise funds or awareness, but to provoke public fury, incite unlawful mob behavior, and apply maximum pressure to force me to capitulate. One of its primary objectives was to cause me extreme emotional suffering — by design.

387.     The webpage published false, malicious, and inflammatory information about me, including defamatory claims of abuse, financial abandonment, and refusal to comply with religious authority. These were calculated to enrage the public and incite action. The page explicitly encouraged readers to share the link until I "gave the Get," and stated or implied that such coercion was morally justified.

388.     The publication of this campaign — rife with incitement, falsehoods, personal attacks, and calls to action — was not merely offensive, but objectively outrageous by any legal standard. It invited harassment, protest, and physical threats against me and my family. All individuals who created, endorsed, reposted, or promoted the campaign — whether through social media, video, or in-person speech — share responsibility for the intentional infliction of emotional distress.

389.    Defendants who organized or participated in the protests and riots physically mobilized threats and intimidation for the purpose of coercion. These in-person confrontations were not lawful protests — they were acts of targeted harassment with the goal of breaking my will and publicly shaming me into religious compliance.

390.    These demonstrations included signs with my personal phone number, chants calling me an abuser, and threats that the mob would return each night until I gave in. Protestors falsely claimed that I was an abuser and deadbeat father, and used intimidation tactics that terrorized my family and myself.

391.    In any civilized society, there can be zero tolerance for the use of intimidation and religious coercion under the guise of protest. No cause — political, religious, or communal — justifies such behavior.

392.    The Edmond J. Safra Synagogue Inc., Rabbi Eli J. Mansour, Yeshiva of Flatbush, Community News, Heshy Tischler, and Amber Adler each hold a position of public, religious, or institutional authority. Their words and endorsements carried outsized influence, which emboldened others and legitimized the mob's actions. As public figures, their incitement and failure to de-escalate must be held to a higher standard of accountability.

393.    These Defendants caused me to receive hundreds of harassing, violent, and threatening messages by phone and text. The effect was immediate, intense, and terrifying.

394.    To give a few examples, on March 8, 2021:

- At 11:09pm, John Doe 1 wrote: "give the get and stop being such a piece of shit," "you're a sick sick man."

- At 9:59pm, John Doe 2 said: "you rat bastard… you better lock the doors tonight."

- At 8:28pm, John Doe 3: "give a get you piece of shit deadbeat."

- At 7:55pm, John Doe 4 warned: "you should be scared of the outcome… what you're doing to Elizabeth is tantamount to murder… do the right thing before it's too late."

- On March 10, 2021, at 9:50am, a Mrs. Tawil sent me a message: "your number is getting around and people are going to do much more than donate very soon… Give people a reason not to spit in your face when they see you."

395.    These messages, and the campaign of harassment that followed, triggered physical and psychological injury: insomnia, appetite loss, social withdrawal, an inability to perform basic tasks.

396.    I now suffer from chronic depression, disturbing nightmares, and overwhelming difficulty functioning in normal life. The trauma remains pervasive and unrelenting.

397.    I experience persistent anxiety, hypervigilance, flashbacks, panic attacks, and debilitating fear. I cannot work, I cannot rest, and I live in dread of retaliation.

398.    have entered trauma therapy and remain under the care of licensed mental health professionals. I anticipate needing long-term treatment and support.

399.    There is no countenance in a lawful society for orchestrated harassment and intimidation aimed at compelling someone to participate in a religious act. The Defendants' conduct is a textbook example of intentional infliction of emotional distress.

400.    As a direct result of this terror campaign, I was forced to flee my own home on March 10, 2021. I sought safety at the local police precinct and was advised to sleep in a secure, undisclosed location — a "safe house." The fear was real and substantiated

401.    The actions of the Defendants — taken individually and collectively — were extreme and outrageous, intolerable in any civilized community, and intended to break me emotionally, psychologically, and spiritually. They succeeded in causing me distress so severe no reasonable person could endure it. They must be held accountable.

## SEVENTH CAUSE OF ACTION-DEFAMATION

**(Against Defendants Elizabeth Kairey, Edmond J. Safra Synagogue Inc., Rabbi Eli J. Mansour, Laurie Beda, Miriam Sabzehroo, Raquel Sabzehroo, Eva Shammah, Isabella Khaimov, Norma Tawil, Nourite Maimon, Heshy Tischler, Amber Adler, Adina Miles, Elisheva Yarimi, and Yaffa Sutton)**

402.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "401" herein with the same force and effect as if the same were set forth at length herein.

403.    Under New York law, a cause of action for defamation arises where a defendant makes a false statement of fact about the plaintiff, publishes that statement to a third party without privilege or authorization, and does so with fault (actual malice or negligence), thereby causing injury to the plaintiff's reputation.

404.    The following Defendants are liable for libel per se for publishing false, defamatory statements in written form on the Free Elizabeth Chesed Fund webpage:

- Elizabeth Kairey

- Edmond J. Safra Synagogue Inc.

- Rabbi Eli J. Mansour

- Laurie Beda

- Miriam and Raquel Sabzehroo (Community News)

- Eva Shammah

- Isabella Khaimov

405.    The webpage prominently featured a photograph of Elizabeth Kairey with her and Plaintiff's daughter, P.R.H., and repeatedly referred to the father — Plaintiff Elliot M. Hirsch — both by name and by unmistakable implication (e.g., "he has refused…").

406.    The page falsely stated and implied the following defamatory and damaging assertions about Plaintiff:

(1) That he refused to pay any child support;

(2) That his ex-wife was forced to support their 4-year-old child alone;

(3) That she needed community support for basic living expenses because of him;

(4) That Plaintiff's conduct had left his ex-wife financially and emotionally burdened;

(5) That he was "waging a relentless legal campaign" against Elizabeth Kairey and her family, including filing numerous appeals;

(6) That he was abusive, emotionally cruel, and unfit for social or communal engagement.

407.    These statements were objectively false, deeply inflammatory, and served no purpose other than to destroy Plaintiff's reputation and provoke widespread harassment.

408.    Plaintiff is not asserting any defamation claim for statements relating to alleged violations of Jewish religious law or labeling him as a "Get refuser." To the extent any Defendant expressed personal religious opinions, Plaintiff does not rely on those religious assertions as the basis for this claim.

409.    Defendants Norma Tawil and Nourite Maimon are additionally liable for defamation per se for falsely claiming that Plaintiff was "not a real lawyer" or a "fake attorney." These statements were made publicly — including in an Instagram Live video — at a time when Plaintiff was duly and lawfully licensed to practice law under temporary authorization by the New York Supreme Court, Appellate Division, Second Department.

410.    These false claims were broadcast publicly to large audiences and made with intent to injure Plaintiff's professional standing and reputation.

411.    Defendants Heshy Tischler, Amber Adler, Adina Miles, Elisheva Yarimi, and Yaffa Sutton are also liable for slander per se, having verbally accused Plaintiff of being an abuser during in-person protests and live streamed videos. These statements were made using loudspeakers, in livestreamed interviews, and on signs held during protests in Brooklyn and New Jersey.

412.    Each of the above statements — whether written or spoken — clearly identified Plaintiff and were understood by the community to concern him personally.

413.    These were not protected opinions but false statements of fact, and were understood by thousands of viewers and readers as assertions of real-world misconduct, not religious commentary.

414.    Defendants made these statements knowing they were false, or with reckless disregard for the truth, and in coordination with others to apply social and reputational pressure.

415.    The publication and repetition of these defamatory statements caused Plaintiff irreparable professional and reputational harm, including but not limited to: Loss of employment and bar admission opportunities; Disqualification from legal positions due to reputational red flags; Ongoing public harassment and exclusion from communal activities.

416.    Specifically, Plaintiff lost several concrete job offers and was turned down from professional opportunities by employers who cited his involvement in the Free Elizabeth campaign and labeled him an "abuser." These employers referenced material found online that was created and disseminated by Defendants, showing direct causal impact on Plaintiff's livelihood.

417.    The Defendants' conduct has further exposed Plaintiff to hatred, ridicule, and contempt throughout Orthodox Jewish communities in both the United States and Israel. Thousands of online comments, likes, and reposts labeled Plaintiff a monster, a criminal, and a dangerous man who should be ostracized and even physically harmed.

418.    These defamatory statements constitute libel and slander per se under New York law, as they charge Plaintiff with serious misconduct, criminal behavior, abuse, and professional fraud.

419.    As a result, Plaintiff is entitled to compensatory damages, presumed damages for libel and slander per se, and punitive damages to deter future defamatory campaigns and to vindicate his legal rights.

## EIGHTH CAUSE OF ACTION – CONVERSION

### (Against Defendant Rabbi Yitzchak Yisraeli)

420.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs "1" through "419" herein with the same force and effect as if fully set forth at length.

421.    Under New York law, the tort of conversion consists of the unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.

422.    On March 11, 2021, Plaintiff Elliot M. Hirsch was coerced into delivering a religious divorce document known as a *Get* to Elizabeth Kairey under extreme emotional duress, mob pressure, and threats of public violence. This Get was physically transferred by Plaintiff to Defendant Yitzchak Yisraeli, who presided as the officiating rabbi (*mesader get*).

423.    The *Get* is a unique physical and religious instrument of profound personal and spiritual significance. It holds intrinsic and symbolic value specific to the Plaintiff as its author and bearer of religious agency. The act of giving the *Get* also carries irrevocable legal, religious, and emotional consequences.

424.    Plaintiff was halachically obligated under Jewish law to notify Defendant Yisraeli — as the officiant — that the *Get* was not given voluntarily. Plaintiff promptly did so after the ceremony, explaining that he had been coerced and threatened, and that the *Get* should be nullified and returned.

425.    Despite this notice, Defendant Yisraeli refused to investigate the matter or to return the *Get* to Plaintiff. He permitted the Get to be processed and finalized despite Plaintiff's express withdrawal of consent — a violation of religious protocol and a legal misappropriation of Plaintiff's property.

426.    Furthermore, Defendant Yisraeli accepted approximately $2,000 in payment for officiating the Get — a sum far exceeding standard rabbinical rates — and then ignored Plaintiff's attempt to reclaim the document once the coercive conditions were disclosed. The payment, and his subsequent refusal to investigate, further evidences bad faith.

427.    By retaining and finalizing the *Get*, despite knowing that it was procured under duress and against Plaintiff's ongoing objection, Defendant Yisraeli wrongfully exercised dominion and control over Plaintiff's personal property.

428.    The Get was not a valid legal document under civil law or under Jewish law, as it was not given voluntarily. Nevertheless, Yisraeli refused to return the object, instead treating it as if it had been lawfully surrendered.

429.    Defendant Yisraeli's conduct thus constitutes conversion — he deprived Plaintiff of his dominion over the physical object and religious instrument, despite full notice that Plaintiff contested its legitimacy and demanded its return. This cause of action does not require the Court to interpret or apply Jewish religious law and does not implicate the Establishment Clause or religious entanglement concerns. Any references to Defendant Yisraeli's obligations under Jewish law — such as his duty to investigate coercion or return the Get — are provided solely for historical context. Plaintiff's legal theory of conversion is based entirely on civil law: he was coerced into giving up a unique personal document under threat and duress, and once he

notified the recipient of that coercion, he was legally entitled to its return. Defendant Yisraeli's continued retention and processing of the Get under these circumstances constitutes unlawful conversion under New York law.

430.    As a result of Defendant Yisraeli's unlawful conversion, Plaintiff has suffered tangible and irreparable harm, including but not limited to: Permanent deprivation of a sacred religious document; Emotional and spiritual anguish stemming from the misuse of the *Get*; Financial loss, including the $2,000 payment rendered for officiation of the Get ceremony; Reputational harm and inability to remedy the religious consequences of the coerced act.

431.    Plaintiff is entitled to compensatory damages for the conversion of his personal property, restitution of the funds paid to Yisraeli, and any other relief deemed appropriate by the Court.

## NINTH CAUSE OF ACTION – NEGLIGENCE

**(Against Defendants Elizabeth Kairey, Rabbi Eli J. Mansour, Rabbi Harold Sutton, Rabbi Max Sutton, and Yeshiva of Flatbush)**

432.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "430" herein with the same force and effect as if the same were set forth at length herein.

433.    Each of the above-named Defendants owed Plaintiff a legal duty to act with reasonable care once they became aware that their conduct, support, or silence in connection with the "Free Elizabeth" campaign was causing Plaintiff significant emotional, reputational, and physical harm.

<u>Defendant Elizabeth Kairey</u>

434.    Plaintiff notified Kairey in writing, including by email, that the protests and online campaign in her name were resulting in threats of violence, reputational damage, and danger to Plaintiff and his daughter.

435.    Despite this knowledge, Kairey did not take any steps to halt or repudiate the campaign. On the contrary, she participated in post-Get celebrations, thanked the organizers, and confirmed in sworn testimony that she benefited financially from the campaign and that she knows who opened the webpage which clearly shows she was in contact with the person who opened the page since she was a direct beneficiary of it plus she knows who was in charge of running it.

436.    Once Kairey had actual notice of the consequences of the campaign, she owed a duty to mitigate the foreseeable harm to Plaintiff, especially given her close involvement and the personal relationship at stake.

437.    Her failure to act reasonably breached that duty. As a proximate result of her breach, Plaintiff suffered emotional trauma, threats of violence, reputational harm, and financial losses — including eventual professional consequences.

<u>Defendant Rabbi Eli J. Mansour</u>

438.    Rabbi Mansour publicly endorsed the "Free Elizabeth" campaign and communicated with protest organizers. He also received personal warnings from Rabbi Yisroel Reisman and Plaintiff's father about the harm being caused.

439.    Rabbi Mansour acknowledged this support, advised Plaintiff to make "reasonable demands," and stated that "pressure must be applied," indicating that he was aware of the protest campaign's purpose and its coercive effect.

440.    By continuing to support the campaign despite knowing of the harm, Rabbi Mansour breached a duty of care to Plaintiff. His influence and leadership position in the community made his endorsement especially powerful and dangerous.

441.    His breach directly contributed to the campaign's momentum, making him a proximate cause of the ensuing harassment, psychological injury, and coerced issuance of the Get.

### Defendants Rabbi Harold Sutton and Rabbi Max Sutton

442.    Both Suttons publicly endorsed the "Free Elizabeth" campaign, lending religious legitimacy to the effort. They are highly influential rabbis within the Syrian Jewish community and known figures in the Haredi rabbinical world.

443.    Their actions induced further participation and donation to the campaign. At no time did they retract their endorsements or express concern — despite publicly known threats and riot planning.

444.    Their support was not religiously neutral, but rather personal, given their close familial and communal ties to Kairey. By endorsing an active campaign known to be coercive

and defamatory, they owed a duty of care to those they knew would be affected, including Plaintiff.

445.    Their breach — continuing to endorse the campaign after public fallout, threats, and defamation — foreseeably caused Plaintiff substantial injury.

Defendant Yeshiva of Flatbush

446.    The Yeshiva of Flatbush Joel Braverman High School, acting through its administration and staff, sent students to the illegal protest on March 11, 2021, during school hours, and rewarded them with "chesed" (community service) credit for their attendance.

447.    School officials, including chaperone Ariella Stavrach Falack, were physically present at the protest where students held signs implicating Plaintiff and joined the crowd calling for religious coercion.

448.    As an educational institution entrusted with the safety and conduct of minors, the Yeshiva owed a heightened duty of care — not only to its students, but also to foreseeable victims of those students' actions, particularly when the institution formally approved and encouraged the activity.

449.    The Yeshiva breached that duty by sending and supervising students at a coercive, unpermitted protest aimed at pressuring Plaintiff to give a Get, and rewarding them for doing so.

450.    That breach foreseeably caused emotional and reputational harm to Plaintiff, and compounded the impression of community-wide legitimacy to the harassment campaign.

Prayer for Relief on This Cause of Action:

451.    As a direct and proximate result of the negligence of the above-named Defendants, Plaintiff suffered emotional distress, reputational injury, loss of personal dignity, financial damage, and the coerced issuance of a religious document.

452.    Plaintiff seeks compensatory damages, costs, and such other relief as the Court deems just and proper.

## TENTH CAUSE OF ACTION – UNJUST ENRICHMENT

**(Against Defendants Jay Butterman, Joel Borenstein, Dr. Mark Rand, and Rabbi Yitzchak Yisraeli)**

453.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "452" herein with the same force and effect as if the same were set forth at length herein.

454.    Defendants Jay Butterman, Joel Borenstein, and Dr. Mark Rand were each retained in connection with family court litigation between Plaintiff and Defendant Elizabeth Kairey.

455.    A substantial portion of the funds raised through the "Free Elizabeth" campaign — approximately $130,000 — were paid to these Defendants as compensation for their legal and professional services. Said campaign was built upon false and defamatory allegations about Plaintiff, including fabricated claims of abuse and neglect, and was designed to publicly shame and coerce Plaintiff into giving a Get.

456.    The Defendants named herein were aware of the nature and purpose of the campaign. The campaign's existence, funding sources, and defamatory content were publicly available and widely disseminated. Plaintiff filed an emergency motion in Kings County Supreme Court on March 9, 2021, seeking to enjoin the campaign and protests, thereby putting all litigants and counsel — including Butterman, Borenstein, and Kairey — on actual notice of the campaign's illegality and harmful effects.

457.    Despite this notice, Butterman, Borenstein, and Rand accepted financial compensation derived from the "Free Elizabeth" fund, and used those funds to prolong litigation and press adverse claims against Plaintiff — including attempts to restrict his visitation with his child, and ultimately securing a judgment of over $100,000 against him.

458.    This judgment is currently being used by the New Jersey Board of Bar Examiners to question Plaintiff's fitness for legal licensure, directly impeding his ability to enter the legal profession and earn a livelihood. Thus, the funds received by Butterman, Borenstein, and Rand were not only unjustly obtained but also caused long-lasting economic and professional injury to Plaintiff.

459.    In addition, Defendant Rabbi Yitzchak Yisraeli accepted $2,000 in compensation to preside over the Get ceremony between Plaintiff and Defendant Kairey. Said ceremony took place under coercive and intimidating circumstances, which invalidated the Get under both Jewish law and civil law principles of consent and voluntariness.

460.    Rabbi Yisraeli was promptly notified by Plaintiff that the Get had been given under pressure, and that it should not be treated as valid. Despite this notification, Yisraeli failed

to investigate the circumstances or refund the fee, and continued to treat the coerced Get as binding, thereby contributing to Plaintiff's ongoing harm.

461.    None of the Defendants named in this cause of action returned any portion of the funds they received, despite their knowledge that the monies were obtained through a coercive and defamatory campaign and that their services furthered the harm inflicted on Plaintiff.

462.    Defendants were enriched by funds that would not have existed but for the false and harmful campaign waged against Plaintiff. Defendants did not earn those funds in a fair and just manner; rather, their enrichment came directly at Plaintiff's expense.

463.    Equity and good conscience require restitution. The Defendants' retention of these funds is unjust given the wrongful nature of the campaign, the known harm it inflicted, and the direct role Defendants played in either enabling or profiting from it.

464.    Plaintiff seeks judgment requiring Defendants Butterman, Borenstein, Rand, and Yisraeli to disgorge the funds they received through the "Free Elizabeth" campaign, and to return those monies to Plaintiff as restitution for the damages he suffered as a direct result of their unjust enrichment.

## ELEVENTH CAUSE OF ACTION-NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendants Elizabeth Kairey and Rabbi Eli J. Mansour)

465.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "464 herein with the same force and effect as if the same were set forth at length herein.

466.    This cause of action is asserted against Defendants Elizabeth Kairey and Rabbi Eli J. Mansour.

467.    Beginning on or about March 8, 2021, and continuing throughout the relevant period, both Kairey and Mansour were in frequent communication with other Defendants involved in the "Free Elizabeth" campaign, including those organizing, attending, and promoting protests and online harassment. Kairey regularly updated these participants regarding Plaintiff's refusal to give a Get and whether or not her objective had been met.

468.    Kairey and Mansour explicitly instructed and/or encouraged other Defendants — including protest organizers and social media influencers — to continue pressuring Plaintiff through public demonstrations, online campaigns, and reputational defamation until he yielded to the demand to issue a Get.

469.    On or about March 8, 2021, both Kairey and Mansour were personally notified — through written communication, verbal outreach, and legal filings — that Plaintiff was receiving threats of violence, harassment, and intimidation tied directly to their campaign and the conduct it encouraged.

470.    Despite this actual notice, Kairey and Mansour chose not to intervene or mitigate the campaign's harm. Instead, they knowingly allowed the public pressure to escalate. In doing so, they breached a duty of reasonable care owed to Plaintiff — a duty that arose when they placed themselves in positions of authority, initiated a coercive campaign, and then learned their conduct was resulting in emotional and physical endangerment to a specific, identified individual.

471.     The risk of emotional trauma to Plaintiff was plainly foreseeable to both Defendants. Indeed, Plaintiff explicitly told both individuals — in real-time — that he feared for his safety and that their continued support of the campaign was exacerbating the threats. In light of that knowledge, a reasonable person would have acted to de-escalate the situation. These Defendants did not.

472.     Defendants' failure to act, and their continued support and encouragement of the protest campaign after receiving notice of the harm being caused, directly and proximately resulted in Plaintiff's severe emotional distress, trauma, and psychological injury. This includes anxiety, insomnia, depression, panic attacks, and other long-term consequences, all documented in Plaintiff's treatment records.

473.     The emotional distress suffered by Plaintiff was serious, verifiable, and reasonably foreseeable. It was not a generalized grievance, but a specific and direct consequence of Defendants' conduct, which was both negligent and reckless in the face of known danger.

474.     Defendants Kairey and Mansour had both the power and opportunity to stop or mitigate the harm and failed to do so. Their acts and omissions constitute negligent infliction of emotional distress under New York law.

## TWELFTH CAUSE OF ACTION – PRIVATE NUISANCE

**(Against All Defendants Who Participated in or Promoted the Protest Outside Plaintiff's Residence)**

475.     Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs numbered "1" through "474" herein with the same force and effect as if the same were set forth at length herein.

476.    Under New York law, a private nuisance is a substantial and unreasonable
interference with the use and enjoyment of land. To be actionable, the interference must be
intentional, negligent, or reckless, and must result in actual harm.

477.    Each Defendant named herein is liable for private nuisance for their respective
roles in instigating, encouraging, organizing, promoting, or personally participating in the illegal
"Free Elizabeth" protest campaign that culminated in a coordinated mob action outside
Plaintiff's home in Oakhurst, New Jersey, on the evening of March 10, 2021.

478.    On that date, Plaintiff received credible notice of a planned protest outside his
residence. Fearing for his safety due to public threats and the nature of prior protests, Plaintiff
fled his home to the local police precinct in Ocean Township, New Jersey.

479.    That night, an illegal mob protest formed outside Plaintiff's residence. Protesters
used car horns, blocked traffic, and created substantial noise and disturbance well into the
evening. The gathering was not permitted by any governmental agency and occurred in violation
of local ordinances.

480.    Although Ocean Township police eventually dispersed the crowd around 10:30
PM, the commanding officer personally advised Plaintiff to avoid returning home for his own
safety and offered him a safe house to sleep in.

481.    As a result, Plaintiff was involuntarily displaced from his own residence — an act
which constitutes a direct and substantial interference with his use and enjoyment of his property.

482.    The nuisance created by Defendants' conduct was not a single spontaneous event,
but a foreseeable outcome of a coordinated campaign designed to pressure Plaintiff through

intimidation and public humiliation. The night protest outside Plaintiff's home was promoted in advance by Defendants via livestreams, Instagram posts, and verbal coordination.

483.    These actions, carried out without permit, at night, on a residential street, with the explicit intent to threaten and coerce Plaintiff, were objectively unreasonable, unlawful, and caused significant disruption and emotional distress.

484.    As a direct and proximate result of the private nuisance created by Defendants, Plaintiff suffered loss of enjoyment of his home, emotional injury, fear, humiliation, and displacement, for which he seeks compensatory and punitive damages.

## THIRTEENTH CAUSE OF ACTION – CIVIL ASSAULT

### (Against All Defendants Except Abraham Manopla and Murray Betesh)

485.    Plaintiff repeats, reiterates, and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

486.    Under New York law, a defendant is liable for civil assault when they intentionally place the plaintiff in reasonable apprehension of imminent harmful or offensive physical contact.

487.    As alleged above, Defendants (excluding Manopla and Betesh) engaged in a coordinated and deliberate campaign of threats, intimidation, and public harassment intended to coerce Plaintiff into surrendering a religious divorce (a Get). This included explicit threats of violence and statements inciting others to physically harm Plaintiff.

488.    On or about March 8–11, 2021, the "Free Elizabeth" campaign webpage — endorsed and promoted by many of the named Defendants — published statements such as "let's

break his legs," "he deserves to be beaten," and similar incitements to physical violence. These threats were seen and shared across Instagram and WhatsApp, reaching thousands of users including Plaintiff.

489.    Defendant Laurie Beda, during a livestream and in public comments, made or amplified threatening statements encouraging violent action against Plaintiff. Beda and others co-led an in-person protest at Corporal Wiltshire Park on March 11, 2021, where she screamed threats about coming to Plaintiff's home the following day if he did not comply with their demands.

490.    These threats were not rhetorical. Plaintiff received hundreds of harassing text messages and calls, including from anonymous users warning that "people are going to do much more than donate very soon," and that he "better lock the doors tonight." These threats included references to physical beatings and "spitting in your face."

491.    The threats culminated in an actual illegal protest outside Plaintiff's home in Oakhurst, New Jersey, on the night of March 10, 2021. Protestors blocked traffic, honked horns, and congregated near Plaintiff's driveway and front door. The situation became so threatening that the Ocean Township Police Department advised Plaintiff to flee his home and offered him a safe house to sleep in for the night.

492.    Plaintiff reasonably feared for his safety based on the Defendants' conduct. The threats were made publicly, repeatedly, and were accompanied by escalating actions, including a physical mob outside his home. No permits had been obtained, and law enforcement acknowledged the danger by advising Plaintiff to leave for his own protection.

493.    Each Defendant named herein either directly issued threatening statements, publicly endorsed or disseminated threats from others, or helped organize, incite, and legitimize the protests and online campaign that caused Plaintiff to experience a well-founded fear of imminent violence.

494.    The civil assault claim does not require physical contact. It is enough that Plaintiff experienced a credible, reasonable apprehension that he would be imminently attacked, based on Defendants' intentional conduct and the surrounding context of mob intimidation.

495.    The widespread nature of the threats, their publication across social media platforms, and the Defendants' continued endorsement and amplification of the "Free Elizabeth" campaign — even after Plaintiff filed emergency court motions for protection — demonstrate intentional and reckless disregard for Plaintiff's physical safety and emotional well-being.

496.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered extreme emotional distress, fear, trauma, loss of sleep, anxiety, and was displaced from his own home. These are classic and recognized harms resulting from a credible threat of imminent bodily harm.

497.    Plaintiff seeks compensatory damages for the harm caused by Defendants' conduct, including emotional distress and loss of enjoyment of life, as well as punitive damages due to the intentional, malicious, and coordinated nature of the assaultive conduct.

## FOURTEENTH CAUSE OF ACTION – CIVIL CONSPIRACY

**(Against All Defendants Except Abraham Manopla and Murray Betesh)**

498.    Plaintiff repeats, reiterates, and incorporates the allegations contained in paragraphs "1" through "497" as if fully set forth herein.

499.    Under New York law, civil conspiracy is not a standalone tort but may be asserted when there is (1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, and (3) resulting harm to the plaintiff. It must also be predicated on an underlying tort, such as defamation, intentional infliction of emotional distress, civil assault, conversion, or private nuisance.

500.    Plaintiff asserts this civil conspiracy cause of action in connection with all underlying state torts alleged in this Complaint, including but not limited to defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, civil assault, private nuisance, unjust enrichment, and negligence. The acts of each Defendant substantially contributed to the injuries described, and each Defendant is jointly and severally liable.

501.    Defendants, acting individually and in concert, agreed — explicitly or implicitly — to coerce, shame, and pressure Plaintiff into issuing a Get through unlawful means including online harassment, public humiliation, religious manipulation, coordinated protests, and emotional and reputational harm. This conspiracy was implemented through social media platforms (Instagram, WhatsApp), live streams, in-person rallies, strategic religious coordination, school-based organizing, and curated fundraising efforts. Each Defendant assumed a distinct role in the execution of the conspiracy and carried out overt acts in furtherance of the shared objective: to punish, shame, and destroy Plaintiff unless and until he gave a Get.

502.    The following Defendants each performed overt acts in furtherance of this conspiracy, as supported by factual allegations set forth earlier in this Complaint:

503.    Elizabeth Kairey originated, promoted, and directly benefited from the "Free Elizabeth" campaign. She provided personal materials and defamatory claims for public dissemination, appeared in celebratory livestreams, and played a central role in sustaining the pressure campaign until Plaintiff capitulated. (See ¶¶ 56–68.)

504.    Rabbi Eli J. Mansour publicly endorsed the campaign, appeared at rallies and in video statements alongside co-conspirators, and admitted to encouraging its continuation and escalation. His religious authority gave communal legitimacy to the campaign. (See ¶¶ 69–87.)

505.    Rabbi Harold Sutton and Rabbi Max Sutton lent their rabbinic names to the public fundraising campaign, giving it credibility. Max Sutton also improperly authorized remarriage based on a Get he knew was the product of coercion. (See ¶¶ 235–238.)

506.    Rabbi David Maslaton played a central and strategic role in the conspiracy. Upon information and belief, he persistently encouraged and coached Elizabeth Kairey to escalate the campaign, advising her not to relent until Plaintiff gave the Get. Maslaton recruited Rabbi Yitzchak Yisraeli — who had no connection to Plaintiff or the relevant community — to officiate the Get despite knowing it was being given under duress and without halachic legitimacy. Masslaton exploited his influence and knowledge of Yisraeli's susceptibility to financial and social pressures. After the Get was issued, Masslaton worked closely with Yisraeli to suppress any investigation and prevent the Get's return or nullification, ensuring that Plaintiff would remain bound by an unlawful act. Unlike other rabbis who later nullified similarly coerced Gets,

Masslaton ensured silence and concealment, serving as a key architect and enabler of the entire scheme.

507.    Rabbi Yitzchak Yisraeli officiated the Get knowing it was given under coercion and pressure, refused to investigate or respond when informed of the circumstances, and acted under the direction of Rabbi Masslaton to allow the Get to stand unchallenged. (See ¶¶ 130–139.)

508.    Laurie Beda and Norma Tawil co-led illegal in-person protests, delivered inflammatory speeches, coordinated harassment at Plaintiff's home, and circulated defamatory materials online and in print. (See ¶¶ 88–102, 103–111.)

509.    Amber Adler and Heshy Tischler appeared at protests and made incendiary remarks to the crowd and on social media; promoted legislation to criminalize Get refusal; and directly contributed to the hostile environment. (See ¶¶ 112–121, 122–130.)

510.    Adina Miles (FlatbushGirl) led rallies with a megaphone, posted coercive threats on Instagram, and threatened to ruin the professional and social reputations of Get refusers. (See ¶¶ 131–144.)

511.    Yeshiva of Flatbush Joel Braverman High School facilitated student participation in at least one protest during school hours and gave chesed credit to students who attended, thereby offering institutional validation to the campaign. (See ¶¶ 145–152.)

512.    Edmond J. Safra Synagogue Inc. hosted the Chesed Fund campaign, which contained defamatory statements and inciting content. The synagogue failed to moderate comments and directly linked its religious brand to the ongoing coercive campaign. (See ¶¶ 49–55.)

513.     Miriam and Raquel Sabzehroo, operating the "@community.news" Instagram platform, posted defamatory content and allowed violent and inciting comments to remain visible and unmoderated, contributing to a mob mentality. (See ¶¶ 196–207.)

514.     Eva Shammah, Eve Scaba, Nourite Maimon, Sari Dana, Deborah Shiloach, Isabella Khaimov, Sherry Chera Halabi, Dalia Oziel, Sarah Mizrachi, Lauren Dagmy, and Yafah Sutton participated in coordinated social media attacks, posted false accusations, circulated protest flyers, and urged harassment through stories, reels, and comments. (See Fact Sections VIII–XXIII, ¶¶ 170–234.)

515.     The City of New York and the NYPD (61st Precinct) failed to disperse illegal gatherings despite being physically present, refused to intervene even after reports of property damage and harassment, and thereby enabled and normalized the coercion campaign. (See ¶¶ 4, 117, 119, and municipal liability allegations.)

516.     Each of these Defendants played a unique but indispensable role in the larger scheme. Some amplified false narratives to mass audiences; others orchestrated real-world disruptions and threats; still others cloaked the campaign in religious legitimacy. Together, their coordinated efforts formed an unlawful agreement to harm Plaintiff in violation of both civil law and the public order.

517.     As a direct and proximate result of this civil conspiracy, Plaintiff suffered irreparable emotional trauma, reputational destruction, career disruption, financial hardship, and spiritual harm.

518.    Plaintiff seeks compensatory and punitive damages against each of the above-named Defendants, jointly and severally, for their participation in this unlawful conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pro Se Elliot M. Hirsch respectfully requests that this Court enter judgment in his favor and grant the following relief:

A.    An award of compensatory damages in an amount to be determined at trial, but not less than $500,000,000 with apportionment among Defendants as determined by the Court or jury;

B.    A permanent and preliminary injunction prohibiting all Defendants from speaking about or otherwise communicating concerning Plaintiff in any public forum, including but not limited to all social media platforms;

C.    A permanent and preliminary injunction enjoining all Defendants from contacting Plaintiff in any form whatsoever, including indirect contact through third parties;

D.    A permanent and preliminary injunction enjoining all Defendants from engaging in any further acts of harassment, intimidation, or public targeting of Plaintiff;

E.    An order compelling Defendants to remove all defamatory content still posted on their websites, social media platforms, or any other public forum, and to issue formal retractions of all false and defamatory statements made about Plaintiff;

F.      An award of punitive and treble damages under applicable federal and state law, including but not limited to RICO and civil rights statutes, due to the Defendants' willful, wanton, and malicious conduct;

G.      An order directing or referring the matter to the Federal Bureau of Investigation and/or United States Department of Justice for investigation of the Defendants' violations of federal criminal law;

H.      An order commanding the return of the physical Get document to Plaintiff, based on his coerced submission and lack of lawful consent;

I.      An order requiring Defendants to return or refund all funds raised through the Free Elizabeth Chesed Fund campaign to the individuals and entities who donated, due to the campaign's fraudulent and unlawful foundation;

J.      An award of such other and further relief as the Court may deem just, equitable, and proper.

## PLAINTIFF'S CERTIFICATION AND WARNINGS

 By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11. I agree to notify the

Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case..

Dated: May 13, 2025

Elliot M. Hirsch

917 750 0418

Address: 7 Saxony Drive, Oakhurst, NJ 07755

County of Monmouth